18-1691-cv
*Knight First Amendment Institute, et al. v. Donald J. Trump, et al.*

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 23rd day of March, two thousand twenty.

PRESENT:

ROBERT A. KATZMANN,
*Chief Judge*,
JOSÉ A. CABRANES,
ROSEMARY S. POOLER,
PETER W. HALL,
DENNY CHIN,
RAYMOND J. LOHIER, JR.,
RICHARD J. SULLIVAN,
JOSEPH F. BIANCO,
MICHAEL H. PARK,
*Circuit Judges*.

---

KNIGHT FIRST AMENDMENT INSTITUTE
AT COLUMBIA UNIVERSITY, REBECCA
BUCKWALTER, PHILIP COHEN, HOLLY
FIGUEROA, EUGENE GU, BRANDON NEELY,
JOSEPH PAPP, and NICHOLAS PAPPAS,

*Plaintiffs-Appellees*,

v.                                                              No. 18-1691-cv

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES and DANIEL SCAVINO,
WHITE HOUSE DIRECTOR OF SOCIAL MEDIA

AND ASSISTANT TO THE PRESIDENT,

*Defendants-Appellants*,

SARAH HUCKABEE SANDERS, WHITE HOUSE
PRESS SECRETARY,

*Defendant*.

| | |
|---|---|
| For Plaintiffs-Appellees: | Jameel Jaffer (Katherine Fallow, Caroline DeCell, Alexander Abdo, Meenakshi Krishnan, *on the brief*), Knight First Amendment Institute at Columbia University, New York, NY, Jessica Ring Amunson (Tassity Johnson, Tali R. Leinwand, *on the brief*), Jenner & Block, Washington, D.C. |
| For Defendants-Appellants: | Jennifer Utrecht (Scott McIntosh, *on the brief*), Attorneys, Appellate Staff, Civil Division, *for* Joseph H. Hunt, Assistant Attorney General, Hashim M. Mooppan, Deputy Assistant Attorney General, Washington, D.C. |

Following disposition of this appeal on July 9, 2019, an active judge of the Court requested a poll on whether to rehear the case *en banc*. A poll having been conducted and there being no majority favoring *en banc* review, rehearing *en banc* is hereby **DENIED**.

Barrington D. Parker, *Circuit Judge*, filed a statement with respect to the denial of rehearing *en banc*.

Michael H. Park, *Circuit Judge*, joined by Richard J. Sullivan, *Circuit Judge*, dissents by opinion from the denial of rehearing *en banc*.

Debra Ann Livingston and Susan L. Carney, *Circuit Judges*, took no part in the consideration or decision of this petition.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK

BARRINGTON D. PARKER, *Circuit Judge*, statement with respect to the denial of rehearing *en banc*.

This case arises from the President's use of the @realDonaldTrump Twitter account (the "Account") as a primary vehicle for his official communications. He uses this account to make official statements on a wide variety of subjects, many of great national importance. The public, in turn, is able to respond to and engage with the President and other users on Twitter. In *Knight First Amendment Inst. at Columbia Univ. v. Trump*, we concluded that this dialogue creates a public forum. 928 F.3d 226 (2d Cir. 2019). We also concluded that when the President creates such a public forum, he violates the First Amendment when he excludes persons from the dialogue because they express views with which he disagrees.

The decision is unusual only in that it involves Twitter, a relatively new form of public, interactive communication, and the President. However, the opinion is consistent with every precedent of this Court, and the dissent does not demonstrate otherwise. It is, I respectfully suggest, a straightforward application of state action and public forum doctrines, congruent with Supreme Court precedent. The dissent misconstrues the applicable law and overstates the scope of the panel's holding.

The dissent's main concern—and its primary  argument—is that the Account is the President's personal account and therefore is not a public forum and its use does not constitute state action. This argument is refuted by even a cursory perusal of examples of the tweets in question. Consider these recent ones:

1



Donald J. Trump ✔
@realDonaldTrump

These Media Posts will serve as notification to the United States Congress that should Iran strike any U.S. person or target, the United States will quickly & fully strike back, & perhaps in a disproportionate manner. Such legal notice is not required, but is given nevertheless!

♡ 382K   3:25 PM - Jan 5, 2020                                    ⓘ

💬 187K people are talking about this                              ⟩



Donald J. Trump ✔ @realDonaldTrump · Jan 4
Iran is talking very boldly about targeting certain USA assets as revenge for our ridding the world of their terrorist leader who had just killed an American, & badly wounded many others, not to mention all of the people he had killed over his lifetime, including recently....

💬 35.3K          ↻ 65.5K          ♡ 294.3K          ↥

Donald J. Trump ✔ @realDonaldTrump · Jan 4
....hundreds of Iranian protesters. He was already attacking our Embassy, and preparing for additional hits in other locations. Iran has been nothing but problems for many years. Let this serve as a WARNING that if Iran strikes any Americans, or American assets, we have.....

💬 8.2K          ↻ 40.9K          ♡ 192.9K          ↥

Donald J. Trump ✔
@realDonaldTrump

....targeted 52 Iranian sites (representing the 52 American hostages taken by Iran many years ago), some at a very high level & important to Iran & the Iranian culture, and those targets, and Iran itself, WILL BE HIT VERY FAST AND VERY HARD. The USA wants no more threats!

5:52 PM · Jan 4, 2020 · Twitter for iPhone

63.2K Retweets    271.5K Likes

These tweets are published by a public official clothed with the authority of the state using social media as a tool of governance and as an official channel of communication on an interactive public platform. The panel decision discussed the President's use of the Account in an official capacity in detail. *See Knight*, 928 F.3d at 232. Excluding people from an otherwise public forum such as this by blocking those who express views critical of a public official is, we concluded, unconstitutional viewpoint discrimination. *Id.* at 234.

I.

The dissent contends that the President's use of the Account to conduct official business does not amount to state action. While the dissent does not dispute that the Account is regularly used as an official channel of communication, it argues that no state action is involved because the President does not exercise "some right or privilege created by the State" when he blocks accounts on Twitter. *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) (Park, J., dissenting from the denial of rehearing en banc, at 2) [hereinafter *Dissent*]. Satisfaction of this condition is said to be required by our decision in *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.2d 178, 186 (2d Cir. 2005).

I do not agree. The state action analysis of the panel was correct. When the President tweeted about Iran he was speaking in his capacity as the nation's chief executive and Commander-in-Chief. If that is not a "right or privilege created by the

3

State" it is difficult to imagine what might be. By the same token, when he receives responses from the public to the Account, and when he blocks responders whose views he disfavors, he remains the President. The critical question in this case is not the nature of the Account when it was set up a decade ago. The critical question for First Amendment purposes is how the President uses the Account in his capacity as President.

The Supreme Court in *Lugar v. Edmondson Oil Co.* identified the test for state action as whether the conduct allegedly causing the deprivation of a federal right is "fairly attributable to the State." 457 U.S. 922, 937 (1982). *Edmondson Oil* instructs us that, where the claim of a constitutional deprivation is directed against a party whose official character is such as "to lend the weight of the State to his decisions," the conduct is state action because it is "fairly attributable to the State." *Id.* The President quintessentially qualifies as a party whose "official character . . . lends the weight of the State to his decisions." *Id.* That, of course, holds true of his current use of Twitter.[1]

---

[1] The dissent misconstrues this statement of views as making the "extraordinary claim that everything the President does is state action or that the test for state action is different for the President." *Dissent* at 3 n.1. That is an inexplicable misreading of the analysis. What the dissent fails to ever seriously address is that when the President blocks users, he blocks them from access to an official account and from engaging in an otherwise open, public dialogue that is created by his use of Twitter to make official statements. Far from saying that everything the President does is state action, the panel narrowly concluded that the President runs afoul of the First Amendment when he prohibits individuals from speaking in an otherwise public, open forum in which he makes official statements.

The dissent further contends that "the panel decision blurred the line between actions by public officials in the performance of their official duties and actions 'in the ambit of their personal pursuits.'" *Dissent* at 5. This ignores the detailed discussion the panel provided concerning the "substantial and pervasive government involvement with, and control over," the Account. *Knight*, 928 F.3d at 235. That discussion noted that the President and his staff use the Account as an official channel of communication with the public on matters of public concern. Press Secretary Sean Spicer confirmed that the President's tweets are official statements of the President. White House staff members are involved in the drafting and posting of tweets to the Account, and the National Archives and Records Administration requires the preservation of the President's tweets as official records under the Presidential Records Act. *Id.* None of this is in dispute.

The dissent states that because "blocking" is a feature available to all users, it cannot be state action. *Dissent* at 3. The panel addressed this argument when the Appellants made it, and the dissent's reiteration breaks no new ground. *See Knight*, 928 F.3d at 235-36. What the dissent never seriously engages with is that when the President blocks users, he blocks them from access to, and interaction with, *an official account*.

The decision was careful to address the areas that generate the dissent's anxiety. We did not consider or decide whether a public official violates the Constitution by excluding persons from a personal, private social media account. Nor did we decide

5

how the First Amendment impacts private social media accounts used by public officials. *Knight*, 928 F.3d at 236. We held only that the First Amendment does not permit a government official who utilizes a social media platform for official purposes to exclude persons from an otherwise open dialogue merely because they expressed views disfavored by the official.

## II.

In *Packingham v. North Carolina* Justice Kennedy discussed the relationship between Twitter and the First Amendment. He said that "[w]hile in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the vast democratic forums of the Internet in general, and social media in particular. . . . [O]n Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. . . . In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." 137 S. Ct. 1730, 1735-36 (2017). If Justice Kennedy is right, as I believe he is, then the dissent is wrong.

Keeping the Supreme Court's words in mind, the panel concluded that the "interactive space" of the Account was a public forum for the purposes of the First Amendment. *Knight*, 928 F.3d at 237. The dissent articulates two concerns with our public forum analysis. Its first objection is to the "disaggregation" of the President's

6

tweets from the interactive features of the Account. *Dissent* at 8. The second objection is that the President did not change the way he uses Twitter after he took office, and therefore he could not have intended to create a public forum. *Dissent* at 7, 11. Again, I respectfully disagree.

## A.

First, the dissent worries that the panel "strayed from" this Court's precedent (which is never specifically identified) when it distinguished between the President's tweets, which it categorizes as government speech, and the 'interactive space' accessible to the public, which the panel concluded constituted a public forum. *Dissent* at 2. The point of departure of our analysis was that "whatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Knight*, 928 F.3d at 237 (quoting *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011)).

A simple analogy to physical public fora makes it clear that the distinction between a tweet and its interactive space is appropriate: at a town hall meeting held by public officials, statements made by the officials are protected government speech. If, however, public comment is allowed at the gathering—as it is on any tweet posted to the Account—the officials may not preclude persons from participating in the debate

7

based on their viewpoints. Significantly, that discrimination is impermissible even when the public forum is limited and is "of [the State's] own creation." *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829 (1995); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place"). Of course, a public forum need not be "spatial or geographic" and even if the forum is metaphysical, "the same principles are applicable." *Knight*, 928 F.3d at 237 (quoting *Rosenberger*, 515 U.S. at 830).

Without citing any authority, the dissent writes that "[i]f an official gives remarks and allows for participation by supporters of the government's policies, that would not require opening the floor to opponents." *Dissent* at 9. That example has nothing to do with the facts before us. Here, the President makes official statements on a platform that allows anyone—not just his supporters—to comment and engage with his statements and with each other. In any event, the line of argument pursued by the dissent is directly contradicted by the Supreme Court: "As soon as municipal officials are permitted to pick and choose . . . the path is cleared for a regime of censorship under which full voice can be given only to those views which meet with the approval of the powers that be." *Se. Promotions, Ltd. v. Conrad.*, 420 U.S. 546, 563 (1975); *see also Rosenberger*, 515 U.S. at 829 (stating that viewpoint discrimination is "an egregious form of content discrimination"). The dissent's contention that a public official could

8

selectively exclude questioners with viewpoints that are disfavored by the official is inconsistent with the First Amendment. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys . . . Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828.

B.

The dissent, citing *Arkansas Educ. Television Comm'n v. Forbes*, contends that we apply public forum precedent to the President's use of the Account in a 'mechanical way.' 523 U.S. 666, 672–73 (1998). I disagree. In *Forbes* the Supreme Court observed that the public forum doctrine first arose in the context of streets and parks, and warned against a "mechanical" extension of the doctrine to television broadcasting. *Id. Forbes* identified two features of parks and streets that television broadcasting does not share: "open access" and "viewpoint neutrality." The Court found that, because television channels create and publish their own content, they "are not only permitted, but indeed required, to exercise substantial editorial discretion in the selection and presentation of their programming." *Id*. at 673.

Twitter possesses both critical attributes identified by the Court in *Forbes* that public broadcasting lacked. First, Twitter is open to the general public. The only limitation Twitter places on creating an account is age-based: those under 13 years of age may not use its services. *See Twitter Terms of Service* at twitter.com/tos (last visited

March 6, 2020). Second, Twitter is neutral with respect to viewpoint; it is a platform on which *the users* publish their views.[2]

C.

Finally, the dissent argues that because the Account was created as a personal one in 2009 it cannot now be a public forum. *Dissent* at 11. As I mentioned, the dispositive consideration is not what the Account may have been in the past, but what it is now. Consider another recent tweet:



---

[2] Section 230 of the Communications Decency Act explicitly allows social media websites (among others) to filter and censor content posted on their platforms without thereby becoming a 'publisher.' 47 U.S.C. § 230(c)(1) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider"). Understood correctly, *Forbes* thus underscores the accuracy of the panel's analysis.

As with the tweet concerning Iran, I believe that under no rational view can tweets such as these be considered "personal."

In determining whether the government has "intentionally opened a nontraditional forum for public discourse" the Court looks to the "policy and practice of the government" as well as "the nature of the property and its compatibility with expressive activity." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985); *see also Knight*, 928 F.3d at 237-39. The Account constitutes a public forum under both considerations the Supreme Court prescribed for forum analysis in *Cornelius*. As the panel noted, "[o]pening an instrumentality of communication 'for indiscriminate use by the general public' creates a public forum." *Knight*, 928 F.3d at 237 (quoting *Perry Edu. Ass'n*, 460 U.S. at 47). The President, upon assuming office, has "repeatedly used the Account as an official vehicle for governance and made its interactive features accessible to the public without limitation." *Id.* I continue to believe that this assessment is correct.[3] Importantly, even if the Account were a non-public forum, excluding individuals who express disfavored views is not permitted. *Cornelius*, 473 U.S. at 806; *see also Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018).

Twitter is undoubtedly a forum compatible with expressive activity. Navigating to Twitter's "About" page (about.twitter.com) reveals a list of statements concerning its

---

[3] The panel's analysis is congruent with the Supreme Court's conclusion in *Se. Promotions, Ltd. v. Conrad* that a privately-owned theater under a long-term lease to the city was nonetheless "a public forum designed for and dedicated to expressive activities." 420 U.S. at 555.

11

purpose: "Spark a global conversation." "See what people are talking about." In *Hague v. C.I.O.*, the Court noted that public fora are "used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." 307 U.S. 496, 515 (1939). As the Court noted in *Packingham v. North Carolina*, that is precisely what social media platforms do. 137 S. Ct. at 1735-36. Twitter is no exception.

III.

The dissent asserts that, while the President's tweets are official speech, other uses of the Account, such as blocking, somehow cause the Account to revert to a personal account. The dissent goes on to insist the panel's disaggregation of the Account's tweets and interactive space is "artificial" and that Twitter itself makes no such distinction. *Dissent* at 8. This argument misunderstands how the platform operates. Twitter accounts include a bundle of features. They come with every account and are available to every Twitter user. Neither government officials nor anyone else is able to individually tailor the features of their accounts. If one navigates to the "Twitter Rules" webpage, a hyperlink at the top of the page labeled "Using Twitter"[4] leads to the following:

---

[4] This page can be found at help.twitter.com/en/using-twitter (last visited March 6, 2020).



Each phrase is a hyperlink to a new page with a detailed explanation of the feature listed. Because every Twitter account comes with every feature listed, the ability to tweet always includes the ability to reply or block. The interactive functions are what you get when you open a Twitter account. The dissent never explains how an account used for official government speech turns into a personal account simply because its user limits who is allowed to see and respond to that speech.

In addition, new features recently announced by Twitter highlight the distinction that the panel correctly made but that the dissent characterizes as "artificial." *Dissent* at 8. One of those features will soon allow Twitter users to limit who can reply to their tweets. These features will allow users to set reply functions to "Global, Group, Panel,

13

and Statement." Global is the current default (and only) setting for public Twitter accounts.[5] The Group setting will allow those who follow the account and those @-mentioned[6] in a tweet to reply, while the Panel setting allows only users @-mentioned in a tweet to reply. The Statement setting does not allow anyone to reply, functionally severing the "interactive space" of the replies from the speech of the tweet itself. The dissent is thus incorrect to contend that Twitter itself does not distinguish between "initial tweets" and "interactive spaces." On the contrary, it is continuing to make the bounds of those interactive spaces more sophisticated and an even more integral part of Twitter.

## IV.

The dissent repeatedly misconstrues the scope of the holding in *Knight*. It worries that the opinion "will reach far beyond the Oval Office, creating uncertainty about the use of social media by public officials at every level of government." *Dissent* at 12. These alarms ring hollow. None of these fears have come to fruition since the publication of the opinion. While the dissent worries that "this decision will have the

---

[5] This allows any Twitter user except those blocked by the original tweeter's account to view and reply to the tweet. "Locked" or "Private" Twitter Accounts are viewable only by followers of the account, and their tweets cannot be "retweeted" by anyone, even followers.
[6] An @-mention creates a hyperlink in the tweet to the account named.

14

unintended consequence of creating less speech," it points to no marked change to how public officials use social media since the opinion was published.[7]

In fact, just the opposite has occurred. In the past few months, the President has been posting on Twitter at more than three times the rate he was tweeting in 2017. These tweets cover subjects as diverse as military actions, immigration policies, and senior staffing changes, among other major official announcements. Twitter is not just an official channel of communication for the President; it is his most important channel of communication.[8]

V.

Federal Rule of Appellate Procedure 35 provides that an en banc rehearing "will not be ordered unless (1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of

---

[7] The dissent cites four cases purportedly to illustrate and document the concerns that the panel decision is just one in a flood of similar lawsuits. *Leuthy v. LePage* was made moot before the panel even heard oral arguments in *Knight*. No. 1:17-cv-0029-JAW, 2018 WL 4134628 (D. Me. Aug. 29, 2018). *Campbell v. Reisch* was filed and argued before the decision of this panel was released. No. 2:18-cv-4129-BCW, 2019 WL 3856591 (W.D. Mo. Aug. 16, 2019). *Hikind v. Ocasio-Cortez* was recently settled. No. 1:19-cv-03956 (E.D.N.Y. filed July 9, 2019). *Garnier v. Poway Unified Sch. Dist.*, No. 17-cv-2215-W (JLB), 2019 WL 4736208 (S.D. Ca. Sept. 26, 2019) was filed in 2017, and cites to *Knight* repeatedly, agreeing at every step with the panel's analysis. In fact, *Garnier* underscores that the analysis of the panel in *Knight* can be applied in a straightforward manner to cases as they arise, even outside of our Circuit.
[8] The President's press secretaries have repeatedly responded to criticisms about the lack of press briefings by pointing out that the press has unprecedented access to him and that he "communicates directly with the American people," which is, of course, a reference to Twitter.

exceptional importance." The dissent fails to offer anything beyond conclusory claims that either standard is met in this case.

A distinctive feature of the Second Circuit is its infrequency of rehearing cases en banc. Judge Jon O. Newman has explained that this approach is grounded in the view, "strongly held by all members of the court, that in bancs are normally not a wise use of judicial resources." Jon O. Newman, *In Banc Practice in the Second Circuit, 1984-1988*, 55 BROOK. L. REV. 355, 369 (1989). I, for one, agree with these views. Judge Newman went on to stress that the collegiality of this Court, and its relative lack of the "vitriolic language unfortunately found in the writings of some other appellate courts," is promoted by the infrequency of en bancs. *Id.* He perceptively notes the benefits that flow to each of us from allowing panels to decide their own cases, and being reluctant to oversee the work of one's colleagues through en banc review. Judge Newman concluded his report on en banc practice in the Second Circuit with the following reflection:

> As the membership of the court changes, there is always the possibility that the pattern of rare in bancs might change. . . . [T]hose coming onto the court . . . will find a rather firmly established tradition. I hope that they—and all who observe the work of this Court—will appreciate the benefits that our practice of infrequent in bancs has conferred upon our institution.
>
> Newman, *supra*, at 503.

I respectfully submit this statement to accompany the denial of rehearing en banc.

MICHAEL H. PARK, *Circuit Judge*, joined by RICHARD J. SULLIVAN, *Circuit Judge*, dissenting from the denial of rehearing *en banc*:

When public officials use personal social-media accounts to express their views, they do not engage in "state action." And the First Amendment's guarantee of free speech does not include a right to post on other people's personal social-media accounts, even if those other people happen to be public officials.

We have declined to rehear *en banc* a decision that extends the First Amendment to restrict the personal social-media activity of public officials. Because the panel opinion contravenes both our state-action and public-forum precedents, I respectfully dissent from the denial of rehearing *en banc*.

This case concerns the President's personal Twitter account, @realDonaldTrump, which he created in 2009, more than six years before taking office. The President "blocked" Plaintiffs from interacting with his account, and they sued, claiming a violation of the First Amendment. The panel held that (1) the President engaged in "state action" when he blocked Plaintiffs from @realDonaldTrump, and (2) the "interactive spaces" of the account—specifically, the thread of replies to each of the President's tweets, but not the tweets themselves—are a public forum. Therefore, the panel concluded that "the President violated the First Amendment when he used the blocking function [of

his personal Twitter account] to exclude" individuals based on their viewpoints. *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 239 (2d Cir. 2019).

This decision strays from our precedents, extends the scope of the First Amendment to encompass the personal social-media activity of government officials, and therefore merits review by the whole court.

I.

Although the panel opinion is correct, as the government concedes, that the President used his personal Twitter account to conduct official business, that does not end the state-action analysis. The panel opinion ignored an important part of the state-action test by failing to consider whether the President exercised "some right or privilege created by the State" when he blocked Plaintiffs from his personal Twitter account. *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 186 (2d Cir. 2005) (citation omitted). "[S]tate action requires *both* . . . the exercise of some right or privilege created by the State . . . *and*" the involvement of "a person who may fairly be said to be a state actor." *Id.* (emphases in original) (internal quotation marks omitted) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)). The "right or privilege" requirement is a well-established feature of

state-action doctrine. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982);

*United States v. Int'l Bhd. of Teamsters, AFL-CIO*, 941 F.2d 1292, 1296 (2d Cir. 1991).[1]

The President did not exercise a "right or privilege created by the State" when he blocked Plaintiffs, and the panel erred in ignoring this requirement. Because Twitter is privately owned and controlled, a public official's use of its features involves no exercise of state authority. Twitter, Inc.—not President Trump or the United States—controls the platform and regulates its use for everyone. In "blocking" Plaintiffs, the President used a Twitter feature available equally to every other user, so his actions were not "fairly attributable to the State." *Flagg*, 396 F.3d at 186 (citation omitted). Therefore, the President was not a state actor when he blocked users from his personal account. He could block users from that account before assuming office and can continue to do so after he leaves the

---

[1] Judge Parker's statement of views with respect to the denial of rehearing *en banc* (the "concurrence") misreads *Edmondson Oil* when it asserts that the President's actions were "fairly attributable to the State" because "[t]he President quintessentially qualifies as a party whose 'official character . . . lends the weight of the State to his decisions.'" *Concurrence* at 4 (citation omitted). *Edmondson Oil* does not support the extraordinary claim that everything the President does is state action or that the test for state action is different for the President. This language simply means that when the actor is a state official, the second prong of the state-action test is satisfied, so the only question is whether that official has "exercised some right or privilege created by the State." 457 U.S. at 937. That is the same question here, which the panel opinion completely overlooks.

White House. He "exercised no special powers possessed by virtue of . . . law" when blocking users, "nor were his actions made possible only because he was clothed with the authority" of law. *Colombo v. O'Connell*, 310 F.3d 115, 118 (2d Cir. 2002) (per curiam) (cleaned up).[2] By ignoring this requirement, the panel decision deviated from this Court's state-action precedents. *See* Fed. R. App. P. 35(a)(1).

None of the evidence emphasized by the panel undermines this point. The panel pointed to numerous instances when the President tweeted about his work in office, but that is not enough to make his personal account a "right or privilege created by the State." Such a rule would preclude government officials from discussing public matters on their personal accounts without converting all activity on those accounts into state action.[3]

---

[2] The panel's reliance on *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975), is misplaced. There, it was undisputed that the government used facilities that were "under their control." *Id*. at 555. So the Court had no reason to consider whether state action was at issue.

[3] For example, when incumbent officials run for reelection, we ordinarily understand them to be expressing a mix of personal and official views. But the panel's reasoning would seem to foreclose incumbents from selecting who can participate in campaign rallies, online groups, or personal events. Similarly, when officials make public statements about their faith or offer prayers, we do not understand them to be violating the Establishment Clause. *See Van Orden v. Perry*, 545 U.S. 677, 723 (2005) (Stevens, *J*. dissenting) ("Our leaders, when delivering public addresses, often express their blessings simultaneously in the service of God and their constituents. Thus, when public officials deliver public speeches, we recognize that their words are not exclusively a transmission from *the* government because those oratories have embedded within them the inherently personal views of the speaker as an individual member of the polity." (emphasis in original)). So too here. The mere fact that Donald Trump uses Twitter for both

4

In addition, the panel's reasoning—that because the President tweets in an official capacity, his use of Twitter's blocking function is state action—operates at the wrong level of analysis. The panel focuses on the status of the entire account—*i.e.*, whether the President's use of Twitter transformed his personal account into an official account—rather than examining the specific action at issue—*i.e.*, whether blocking Plaintiffs from accessing the interactive features of his personal Twitter account amounts to state action. But this Court has explained that we should "look to the nature of the officer's act, not simply his duty status." *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994). By departing from the law of state action, the panel decision blurred the line between actions by public officials in the performance of their official duties and actions "in the ambit of their personal pursuits." *Id*. at 548 (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)). And by fixating on the President's recent tweets, the panel opinion and the concurrence fall into a logical fallacy—*i.e.*, that *some* official use of a Twitter account turns *all* use, or even *all* tweets, into state action. Our precedent calls for a more nuanced analysis that focuses on the specific feature at issue, which is the President's ability to block users.

---

personal and official communication does not transform all of his Twitter activities into state action.

5

Finally, the panel's reliance on evidence from the factual record unmoored from state-action doctrine introduces confusion about when a public official's personal social-media activity becomes state action. For example, it is not clear from the panel's decision *when* President Trump's Twitter activity crossed into state action. Did it happen on Inauguration Day? Upon a particular "official announcement" from @realDonaldTrump? And how many "official" tweets does it take to convert "personal" tweets into state action? The panel decision raises difficult questions but provides little guidance for officials today or to litigants, lawyers, and judges tomorrow.

## II.

Even assuming state action, the panel's application of First Amendment public-forum doctrine to @realDonaldTrump is a poor fit, as is the characterization of the account's "interactive spaces" as a public forum. The panel opinion's public-forum analysis strayed from precedent in two ways. First, it is well established that when the government engages in its own speech, it is permitted to "speak for itself" and to "select the views that it wants to express." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467–68 (2009) (citations omitted). Thus, where government speech is at issue, forum analysis does not apply. *Id*. To avoid

6

this result, the panel disaggregated the President's Twitter feed into his initial tweets, which it recognized as government speech, and "his supervision of the interactive features of the Account," which it excluded from that speech. *Knight*, 928 F.3d at 239. With this move, the panel concluded that the "interactive spaces" are a public forum. *Id*. at 234. But the panel cannot have it both ways, and the Supreme Court has warned against extending the public-forum framework in just this sort of "mechanical way." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672–73 (1998).

Second, the panel opinion erred in finding that the President created a public forum by continuing to use Twitter's features the same way he did before taking office, even though "[t]he government 'does not create a public forum by inaction or by permitting limited discourse.'" *Perry v. McDonald*, 280 F.3d 159, 167 (2d Cir. 2001) (emphases removed) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)).

A.

The Supreme Court has warned that we should be "wary of the notion that a partial analogy in one context," *i.e.* public-forum doctrine, "can compel a full range of decisions in such a new and changing area." *Denver Area Educ. Telecomms.*

7

*Consortium, Inc. v. FCC*, 518 U.S. 727, 749 (1996) (plurality opinion) (Breyer, *J*.).

"Having first arisen in the context of streets and parks, the public forum doctrine should not be extended in a mechanical way" to new areas if it is not "compatible with [their] intended purpose." *Forbes*, 523 U.S. at 672–73 (citation omitted). For example, the Supreme Court has noted the limited applicability of the public-forum framework to public television because "public broadcasting as a general matter does not lend itself to scrutiny under the forum doctrine." *Id.* at 675.

The panel here engaged in just the sort of mechanical extension of the public-forum framework that the Supreme Court has warned against. To shoehorn Twitter into public-forum doctrine, the panel carved out "interactive spaces" from the tweets to which they are connected. It acknowledged that the tweets are government speech, but then applied public-forum doctrine to the "interactive spaces." This disaggregation of Twitter's features was wholly artificial—Twitter's own rules make no such distinction between "initial tweets" and "interactive spaces."[4] The panel then stretched the concept of a public forum,

---

[4] The concurrence points to future updates to Twitter's platform that it believes will "highlight the distinction that the panel correctly made" between tweets and "interactive spaces." *Concurrence* at 13. But the possibility that relevant features may change even before this litigation has concluded should not comfort us, but make us wary of imposing rigid and potentially constricting legal frameworks on fast-evolving technologies.

which was originally meant to ensure that "members of the public retain strong free speech rights when they venture into public streets and parks," to hold that the President may not use his personal account on a private company's website in a certain way. *Pleasant Grove City*, 555 U.S. at 469. The panel engaged in this forced analysis because the personal social-media pages of government officials do "not lend [themselves] to scrutiny under the forum doctrine" the way a sidewalk or park might. *Forbes*, 523 U.S. at 675.

A few examples illustrate the illogic of applying public-forum doctrine in connection with government speech. If an official gives remarks and allows for participation by supporters of the government's policies, that would not require opening the floor to opponents. Or if an official distributes pamphlets and solicits letters from the public, that would not deprive the official of editorial discretion to select which responses to publish. Likewise, if tweeting an official message on a personal Twitter account were government speech, then it should not deprive a public official from blocking certain users. *See, e.g., Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2251 (2015) ("The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that

9

of a mere forum-provider."); *see also Manhattan Cmty. Access Corp. v. Halleck,* 139 S. Ct. 1921, 1937 (2019) (Sotomayor, *J.,* dissenting) (noting that in the context of "government speech," "picking favored viewpoints is appropriately commonplace").

It would be illogical and impractical to apply forum doctrine to such scenarios by bifurcating government speech and "interactive spaces" to require the airing of competing views. That is because the purpose of such speech, including the "interactive spaces" that may accompany it, is to convey the government's views, not to create a public forum.

### B.

Second, the panel opinion erred in concluding that the President "intentionally" turned his Twitter account into a public forum. *Knight,* 928 F.3d at 237. It is well established that the government can create a public forum "only by *intentionally* opening a nontraditional forum for public discourse." *Cornelius,* 473 U.S. at 802 (emphasis added). We have explained that "[t]he government 'does not create a public forum by inaction or by permitting limited discourse.'" *Perry,* 280 F.3d at 167 (emphases omitted) (quoting *Cornelius,* 473 U.S. at 802).

None of the factors considered by the panel indicates that the President intentionally opened his Twitter account to public discourse. The panel based its conclusion on factors such as the general public's access to the "interactive spaces," the ability of Twitter users to reply and retweet, the holding out of the account as a means the President employs to communicate, and the expressive activity in the interactive spaces. *Knight*, 928 F.3d at 235–36. But none of these factors speaks to the President's intention, and the record is clear that Donald Trump set up @realDonaldTrump in 2009 to convey his own views, not to open a forum for public discourse. Nor are the "interactive spaces" of Twitter intended to provide open access for all. For one thing, only those with a Twitter account can retweet, reply, or like a tweet. Moreover, Twitter provides features like "blocking" precisely to enable users to limit access to and to curate activity on their accounts. Indeed, Twitter describes itself as "a place to share ideas and information, connect with your communities, and see the world around you," and it explains that "[i]n order to protect the very best parts of that experience, we provide tools designed to help you control what you see and what others can see about you, so that you can express yourself on Twitter with confidence."[5]

---

[5] *How to Control your Twitter Experience*, Twitter, https://help.twitter.com/en/safety-and-security/control-your-twitter-experience (last visited Mar. 13, 2020).

Under the panel's reasoning, if a public official speaks on a platform that automatically permits others to comment, then the official is responsible for creating a public forum. This is inconsistent with our holding that the government cannot create a public forum by "inaction" alone, and it illustrates how a strict application of public-forum doctrine is ill-suited for social media. *See Perry*, 280 F.3d at 167 (citation omitted).

## III.

Courts should be circumspect in extending legal doctrines to new and evolving technologies outside the realm of judicial expertise. This is particularly true when the result may have significant implications for interactions between government officials and the public.

The panel opinion will reach far beyond the Oval Office, creating uncertainty about the use of social media by public officials at every level of government. Public officials today routinely maintain social-media accounts for official, personal, and campaign use, and they address issues of public concern on all of them. To be sure, the President's use of Twitter is unprecedented in some respects. But it is now commonplace for politicians to use personal accounts to promote their official activities. The key facts in this case—that the President had

a personal Twitter account, that he used it to tweet on matters relating to his office, and that the public was able to comment on his tweets—are not unique. Indeed, this case is just one of several similar lawsuits challenging the right of public officials to use personal social-media accounts in a private capacity. *See, e.g., Hikind v. Ocasio-Cortez*, No. 1:19-cv-03956 (E.D.N.Y. filed July 9, 2019) (suit against congresswoman for blocking user on personal Twitter account, since dismissed with the consent of the parties); *Campbell v. Reisch*, No. 2:18-CV-4129-BCW, 2019 WL 3856591 (W.D. Mo. Aug. 16, 2019) (suit against state legislator for blocking user on Twitter campaign page), *appeal filed* No. 19-2994 (8th Cir. Sept. 16, 2019); *Leuthy v. LePage*, No. 1:17-cv-00296-JAW, 2018 WL 4134628 (D. Me. Aug. 29, 2018) (suit against governor for blocking user on Facebook); *Garnier v. Poway Unified Sch. Dist.*, No. 17-cv-2215-W (JLB), 2019 WL 4736208 (S.D. Cal. Sept. 26, 2019) (suit against school officials for blocking residents on Facebook and Twitter).

Our decision in this case will affect how public officials may use social media, making them less able to defend themselves from hate and harassment. It will limit how public officials may act in a personal capacity in all aspects of their life, online or otherwise, by writing the "right or privilege" requirement out of state-action doctrine. And it will bind us to apply public-forum doctrine when

13

analyzing social-media activity, even though the framework is a poor fit for how social media actually functions. These are issues of "exceptional importance" and merit review by the whole court. Fed. R. App. P. 35(a)(2).

The panel decision concludes with the statement that "the best response to disfavored speech on matters of public concern is more speech, not less." *Knight*, 928 F.3d at 240. Despite the concurrence's premature reassurances to the contrary, it seems likely to me that this decision will have the unintended consequence of creating less speech if the social-media pages of public officials are overrun with harassment, trolling, and hate speech, which officials will be powerless to filter. The panel's effort to extend public-forum doctrine to social media is a mismatch and highlights why courts "should be cautious in applying our free speech precedents to the internet" and thus "should proceed circumspectly, taking one step at a time." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1744 (2017) (Alito, *J.*, concurring in the judgment).

For these reasons, I respectfully dissent from the denial of rehearing *en banc*.