# United States Court of Appeals
### For the Eighth Circuit

_____

No. 19-2994
_____

Mike Campbell

*Plaintiff - Appellee*

v.

Representative Cheri Toalson Reisch

*Defendant - Appellant*

------------------------------

Electronic Frontier Foundation; Knight First Amendment Institute at Columbia University

*Amici on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City
_____

Submitted: November 17, 2020
Filed: January 27, 2021
_____

Before COLLOTON, ARNOLD, and KELLY, Circuit Judges.
_____

ARNOLD, Circuit Judge.

After Missouri state representative Cheri Toalson Reisch blocked Mike Campbell from her Twitter account, he sued her under 42 U.S.C. § 1983, claiming she had violated the First Amendment by denying him the right to speak. Following a bench trial, the district court agreed with Campbell, declared that Reisch had violated his rights, and ordered her to stop blocking Campbell and others because of the content or viewpoint of their speech. Reisch appeals, arguing, among other things, that Campbell is not entitled to § 1983 relief because she was not acting under color of state law when she blocked him. We agree with Reisch, and so we reverse and remand.

As the district court explained in its findings of fact, the social media platform Twitter allows its users to publish short messages, photographs, videos, and hyperlinks (all called tweets) to the general public. Other users may respond to or republish those tweets and engage in virtual dialogues with other users on the platform. They may even "follow" other users, and when they do, they will receive those users' tweets automatically on their feed, which is a continuously-updating scroll of new tweets from other users. But a user may also block certain followers, and if they attempt to follow or access the blocking user's page or messages, they will receive a message informing them of the block.

Reisch created her Twitter account in September 2015 when she announced her candidacy for state representative. Her very first utterance read, "I am proud to announce my candidacy to represent Missouri's 44th District. Let's work together & create opportunities for jobs & education." A few months later, she posted a copy of a letter on her campaign stationery seeking contributions to her campaign and a photo of herself with the Speaker of the Missouri House. As the district court observed, "[t]hroughout the first ten months of 2016, [Reisch] posted dozens of tweets about her campaign for the Missouri House, frequently using the hashtags #MO44 and #TeamCheri."

Reisch won her election in November 2016, and, over the next eighteen months, she tweeted about her work as a state representative and posted pictures of herself on the House floor or standing with other elected officials. Typical examples include a message where Reisch said she "was humbled to commit myself to represent everyone in the 44th District & uphold the Constitution of Missouri. #MOLeg." In another, she stated she was "[t]hrilled to have so many of my neighbors from the 44th District come by the office at tonight's energetic Governor's Ball! #MOLeg #MO44." She later forwarded a message from the House members of her political party saying they were "proud to deliver results during the first half of session that will bring job growth to MO. #moleg." Accompanied by a photograph of Reisch with the House Speaker, she once also posted, "I promised my neighbors in #MO44 that I'd work tirelessly to improve our #economy. I'm making good on that promise." She tweeted about specific legislation (such as Real ID, "Right to Work," and tort reform laws), about testifying before the state senate, and about times when the governor and lieutenant governor visited her district. Finally, she touted her performance as a representative, stating things like "[a]ccomplished much in my 1st 2 years, ready for the next 2" and, in relation to a legislative scorecard from a group called "United for Missouri," "I scored an A. Not bad for a Freshman." As the district court noted, Reisch "used her Twitter page to engage in discourse about political topics and/or to indicate her position relative to other government officials."

The message that Campbell identifies as the impetus for Reisch's block concerned her appearance at a local event that featured a pledge of allegiance to the flag. Reisch tweeted, "Sad my opponent put her hands behind her back during the Pledge." Another state representative responded the next day to say that Reisch's opponent's "father was a Lieutenant Colonel in the Army. Two of her brothers served in the military. I don't question [the opponent's] patriotism. That's a low blow and unacceptable from a member of the Boone County delegation." Campbell, one of Reisch's constituents, retweeted that response on his own page. He later received a

-3-

message that Reisch had blocked him. The district court found that Reisch had also blocked at least 123 other Twitter users.

The First Amendment, by its terms, prohibits only governmental abridgment of speech. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). By not interfering with private restrictions on speech, the amendment "protects a robust sphere of individual liberty." *Id.* Similarly, "§ 1983 excludes from its reach merely private conduct," in that, for a § 1983 claim to succeed, a defendant must have acted "under color of" state law. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). It is not enough that the defendant is a public official, because acts that public officials take in "the ambit of their personal pursuits" do not trigger § 1983 liability. *See Magee v. Trs. of Hamline Univ.*, 747 F.3d 532, 535 (8th Cir. 2014).

So the question this case presents is whether Reisch acted under color of state law when she blocked Campbell on Twitter. Campbell maintains that she did because she blocked him for criticizing her fitness for political office even though she had created a virtual forum for the public to discuss "the conduct of her office." Reisch says she didn't act under color of state law because she runs this Twitter account in a private capacity, namely, as a campaigner for political office. The district court concluded that Reisch had acted under color of state law, but along the way, the court appeared to agree that Reisch had used the account to further her campaign, and it relied on that fact to support its conclusion that Reisch had acted under color of law. Campbell does not defend this portion of the district court's opinion on appeal, and not without reason: Running for public office is not state action; it is a private activity. Campbell does say, though, that he is entitled to prevail nonetheless because Reisch acted under color of state law for other reasons. He also points out that Reisch did not rely on the campaign nature of her account in her argument before the district court, but given the district court's attention to the subject and given that Reisch has

argued all along that she did not act under color of state law, we will consider her argument. *See Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 890–91 (8th Cir. 2009).

The parties differ over the standards we should apply to determine if Reisch acted under color of law. Reisch maintains that "[a] public employee acts under color of law when [s]he exercise[s] power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *See Magee*, 747 F.3d at 535. She then argues that she did not use some power state law had granted her to block Campbell, and denies that state law had otherwise clothed her with authority to block him. Anyone, whether a state representative or not, can block someone on Twitter, and so, the argument runs, Reisch simply could not have acted under color of state law.

Campbell, on the other hand, asks us to take a more holistic view of the color-of-law question. He maintains that, for a defendant to act under color of law, her actions need only be "fairly attributable" to the State, which "is a matter of normative judgment" whose "criteria lack rigid simplicity." *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). Campbell's approach finds support in two circuit court opinions dealing with social media blocks. *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 235–36 (2d Cir. 2019); *Davison v. Randall*, 912 F.3d 666, 679–80 (4th Cir. 2019). We do not decide which approach is correct because we think that, even applying the one Campbell advances, the record will not support a conclusion that Reisch acted under color of law.

Campbell encourages us to follow the path taken by *Trump* and *Davison* and conclude that Reisch acted under color of state law. In *Davison*, the chair of a local governmental board, Phyllis Randall, blocked a constituent from a Facebook page. 912 F.3d at 672–73. The page, titled "Chair Phyllis J. Randall," was created the day before Randall was sworn in as chair, and she designated the page "governmental

official." Randall also had a personal Facebook page and a page devoted to her campaign. *Id.* at 673. As the Fourth Circuit pointed out, Randall used the page "as a tool of governance" by updating constituents about the county's activities and emergency responses, as well as by soliciting public input on policy issues. *Id.* at 680. And it bore certain "trappings" of her office, including a page title that noted Randall's official title, lists of official contact information, links to the official county website, posts about official activities, and even posts expressly directed to all of Randall's constituents. *Id.* at 680–81.

In *Trump*, the Second Circuit considered President Trump's Twitter account, which was unabashedly used for official purposes. President Trump and members of his administration described the account as official and used it to announce, describe, and defend policies; to promote his legislative agenda; to announce official decisions; and to engage with foreign leaders, among other things. 928 F.3d at 231. His press secretary described the tweets as "official statements" of the president, members of his administration helped him operate the account, and even the National Archives deemed the tweets "official" for purposes of archiving them. *Id.* at 231–32, 235–36. As that court explained, "the evidence of the official nature of the Account is overwhelming." *Id.* at 234. The court reached this conclusion even though President Trump had created the account long before he became president. *Id.* at 235. The court was careful to note, however, that "not every social media account operated by a public official is a government account." *Id.* at 236.

We hold that Reisch's account is the kind of unofficial account that the *Trump* court envisioned. First of all, no one seriously disputes that her account at least began life as a private account because Reisch was not a public official when she created it. Indeed, it seems safe to say that someone who isn't a public official cannot create an official governmental account. But even if Reisch had been a public official at the time, we would still hold that she had not created an official governmental account because she used it overwhelmingly for campaign purposes: She created the account

the day she announced her candidacy; she solicited donations to her campaign on the account; and, for over a year, she sought to convince her audience to support her election bid.

We don't intimate that the essential character of a Twitter account is fixed forever. But the mere fact of Reisch's election did not magically alter the account's character, nor did it evolve into something different. A private account can turn into a governmental one if it becomes an organ of official business, but that is not what happened here. The overall theme of Reisch's tweets—that's she's the right person for the job—largely remained the same after her electoral victory. Her messages frequently harkened back to promises she made on the campaign trail, and she touted her success in fulfilling those promises and in her performance as a legislator, often with the same or similar hashtags as the ones she used while a candidate. So it seems to us that Reisch used the account in the main to promote herself and position herself for more electoral success down the road—a conclusion supported by the campaign-related tweet that led to this litigation. We acknowledge that she occasionally used the account to provide updates on where certain bills were in the legislative process or the effect certain recently enacted laws had had on the state. But tweets like these are fully consistent with Reisch using the account to tout her record because they show voters that she was actively advancing her legislative agenda and fulfilling campaign promises. They also revealed where she stood on relevant political issues. In sum, her post-election use of the account is too similar to her pre-election use to suggest that it had morphed into something altogether different.

Reisch's account is fundamentally different from the accounts at issue in *Trump* and *Davison*. For one thing, official governmental activity was conducted on those accounts, whether it was President Trump announcing an appointee or conducting foreign affairs, or Chairwoman Randall coordinating her county's response to a blizzard. Even if Reisch's official duties as a representative extend beyond voting or participating in committee meetings and include things like communicating with

constituents about legislation, her sporadic engagement in these activities does not overshadow what we believe was quite clearly an effort to emphasize her suitability for public office. The dissent points to a few tweets that Reisch posted after the election to support the view that she changed the way in which she was using her account. These messages are necessarily different from previous ones because they report on events that occurred in the state legislature. But it is not obvious that their purpose was different. They were consistent with a desire to create a favorable impression of Reisch in the minds of her constituents. Reisch's new tweets, moreover, also provided information on her local political party's annual chili supper and Lincoln Day banquet, featured pictures of her posing with young boys who had brought her chocolate, and reported that her niece would be voting for a particular political candidate. The main point is that occasional stray messages that might conceivably be characterized as conducting the public's business are not enough to convert Reisch's account into something different from its original incarnation.

The district court also noted that Reisch's Twitter page had what the *Davison* and *Trump* courts called "trappings" of an official account. For example, the court pointed out that Reisch's twitter handle, @CheriMO44, refers to the district she represents and her role as state representative. The court also drew attention to photos at the top of the Twitter page showing Reisch on the House floor and to Reisch's discussion of political issues. But even if these can be trappings of an official account, they can quite obviously be trappings of a personal account as well. The *Trump* and *Davison* courts were not concerned with distinguishing an official page from a campaign page as we are, and so they do not offer much guidance for deciding this case. The Twitter page of a political candidate does not convert itself into an official page just because the candidate chooses a handle that reflects the office she is pursuing (which Reisch did here before she became an elected official) or because she posts a photo of herself working at the job she was elected to perform and hopes to be elected to perform again. And a campaign page certainly doesn't become something else simply because it discusses political topics. One can expect

discussions of political topics on such a page, and Reisch in fact discussed them on the account before she became a government official. All these "trappings" are just too equivocal to be helpful here.

In short, we think Reisch's Twitter account is more akin to a campaign newsletter than to anything else, and so it's Reisch's prerogative to select her audience and present her page as she sees fit. She did not intend her Twitter page "to be like a public park, where anyone is welcome to enter and say whatever they want." *See Morgan v. Bevin*, 298 F. Supp. 3d 1003, 1011 (E.D. Ky. 2018). Reisch's own First Amendment right to craft her campaign materials necessarily trumps Campbell's desire to convey a message on her Twitter page that she does not wish to convey, *see Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 559 (1995), even if that message does not compete for room as it would, say, in a campaign newsletter. While Reisch's posts open up an interactive space where Twitter users may speak, that doesn't mean that Reisch cannot control who gets to speak or what gets posted. It's her page to manage as she likes. Though Campbell and others may not like how Reisch runs her page, "the place to register that disagreement is at the polls," *see Morgan*, 298 F. Supp. 3d at 1013, or, at least, on Campbell's own page.

We therefore reverse and remand for the district court to enter judgment in Reisch's favor.

KELLY, Circuit Judge, dissenting.

Missouri State Representative Cheri Toalson Reisch appeals the district court's adverse judgment that she violated Mike Campbell's First Amendment rights by blocking him from her Twitter account. Because I believe Reisch was acting under color of state law when she blocked Campbell, I respectfully dissent.

-9-

# I.

Under 42 U.S.C. § 1983, "a public employee acts under color of state law while acting in [her] official capacity or while exercising [her] responsibilities pursuant to state law." Jones v. Gutschenritter, 909 F.2d 1208, 1211 (8th Cir. 1990) (quoting West v. Atkins, 487 U.S. 42, 50 (1988)); see also Filarsky v. Delia, 566 U.S. 377, 383 (2012) ("Anyone whose conduct is fairly attributable to the State can be sued as a state actor under § 1983." (cleaned up)). Here, the court's determination that Reisch was not acting under color of state law rests on its finding that Reisch used her Twitter account mainly to "position herself for more electoral success down the road." In my view, this finding is neither supported by the record nor dispositive of the state-action inquiry.

Reisch's election to public office may not have "magically alter[ed]" the character of her Twitter account, as the court notes, but it did change how she used the account and for what purpose. See Knight First Amend. Inst. at Columbia Univ. v. Trump (Knight II), 953 F.3d 216, 219 (2d Cir. 2020) (denial of reh'g en banc) (Parker, J., statement with respect to denial of reh'g en banc) (explaining that the "critical question for First Amendment purposes" is "not the nature of the Account when it was set up a decade ago," but rather, "how the President uses the Account in his capacity as President."). Before Reisch was sworn in, her tweets used her campaign hashtag ("#TeamCheri"), invited people to join her campaign team, solicited campaign donations, and publicized endorsements from various groups and individuals. By contrast, between January 2017 and February 2019 (when she apparently deleted her Twitter account), Reisch did not tweet a single request for campaign donations, or make any reference to "#TeamCheri." Instead, the majority of Reisch's tweets and retweets after January 2017 reported on new laws ("MO citizens will now have a choice to get Real ID compliant license"); provided information about the Missouri legislature's work ("A big thanks to House Communications for doing this great story on this piece of legislation that was

-10-

passed"); and informed the public of Reisch's own official activities ("I spoke [on the Missouri House floor] about my 34 years experience with prevailing wage. Repeal it. Save taxpayers $."). Cf. Knight First Amend. Inst. at Columbia Univ. v. Trump (Knight I), 928 F.3d 226, 235-36 (2d Cir. 2019) (emphasizing that President Trump used his Twitter account "as a channel for communicating and interacting with the public about his administration" and to "announce matters related to official government business"), reh'g denied en banc, Knight II, 953 F.3d 216 (2d Cir. 2020). Through her Twitter account, Reisch also interacted with Missouri residents, including a fourth grade teacher who thanked Reisch for speaking to students about "a [s]tate [r]epresentative's job." Moreover, in addition to using her Twitter account as a "tool of governance," Reisch "clothed [it] in the trappings of her public office." See Davison v. Randall, 912 F.3d 666, 680 (4th Cir. 2019) (cleaned up). She set her location to "District 44, Missouri, USA," described herself in her bio as "MO State Rep 44th District," displayed a profile photo taken in the Missouri House chamber, and used a large photo of her swearing-in ceremony as the banner at the top of her Twitter feed. In short, Reisch's persistent invocation of her position as an elected official overwhelmed any implicit references one might perceive to her campaign or future political ambitions.

The court characterizes Reisch's tweets as merely "show[ing] voters that she was . . . fulfilling campaign promises." And it is true that public officials acting purely in pursuit of personal interests do not do so "under color of state law." See, e.g., S.J. v. Kan. City Mo. Pub. Sch. Dist., 294 F.3d 1025, 1027 (8th Cir. 2002). This does not mean, however, that an official whose challenged conduct is closely related to her official responsibilities cannot act "under color of state law" simply because her actions simultaneously further personal goals or motives. See Dossett v. First State Bank, 399 F.3d 940, 949-50 (8th Cir. 2005) ("Just as a police officer conspiring to obtain a search warrant based on false evidence, or a judge agreeing to issue an injunction in exchange for a bribe, may act under color of law . . ., a school official reaching a mutual understanding with a private actor to retaliate against a private

-11-

citizen for questioning the work of the school board may do the same." (cleaned up)); cf. Does 1-10 v. Haaland, 973 F.3d 591, 601-02 (6th Cir. 2020) (concluding that Congressmembers were acting within the scope of their employment when they criticized a political opponent's supporters on Twitter because "the act of communicating one's views" to the public falls within the "wide range of legitimate 'errands' performed for constituents"); Council on Am. Islamic Rels. v. Ballenger, 444 F.3d 659, 665 (D.C. Cir. 2006) ("[A] primary obligation of a Member of Congress in a representative democracy is to serve and respond to his or her constituents." (cleaned up)). Indeed, it seems that the statements of lawmakers carrying out their official duty to communicate information to constituents will very often harken back to some campaign promise or another, so this factor does not merit the outsized importance the court places on it today.

On this record, and given the focus of the "under color of state law" inquiry on the "actual or purport[ed]" relationship between Reisch's conduct and her official duties, see, e.g., Lee ex rel. Lee v. Borders, 764 F.3d 966, 971 (8th Cir. 2014), I cannot conclude that Reisch used her Twitter account primarily for campaign purposes, let alone that she made such a showing by a preponderance of the evidence. Instead, evidence that Reisch blocked Campbell "to suppress speech critical of [her] conduct of official duties or fitness for public office," Davison, 912 F.3d at 680 (quoting Rossignol v. Voorhaar, 316 F.3d 516, 524 (4th Cir. 2003)), strengthens the inference that her conduct was attributable to the state. See id. ("[A] challenged action by a government official is fairly attributable to the state when 'the sole intention' . . . in taking the action was 'to suppress speech critical of his conduct of official duties or fitness for public office.'" (quoting Rossignol, 316 F.3d at 524)).

## II.

Having concluded that Reisch was acting under color of state law, I also believe that Reisch engaged in viewpoint discrimination in violation of the First

Amendment. We generally use a forum-based approach to evaluate the suppression of speech on government-owned or government-controlled property.[1] See, e.g., Minn. Voters All. v. Mansky, 138 S. Ct. 1876, 1885 (2018). There are "three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." Id. A designated public forum is a "space[] that [has] not traditionally been regarded as a public forum," such as a park, street, or sidewalk, "but which the government has intentionally opened up for that purpose." Id. (cleaned up); cf. id. at 1886 (applying forum analysis to polling places because they are, "at least on Election Day, government-controlled property"); Denver Area Educ. Telecomms. Consortium, Inc. v. F.C.C., 518 U.S. 727, 742 (1996) (Kennedy, J., concurring in part, concurring in judgment in part, and dissenting in part) ("Public fora do not have to be physical gathering places, nor are they limited to property owned by the government." (cleaned up)). In both traditional and designated public forums, the government may not impose viewpoint-based restrictions on speech. Mansky, 138 S. Ct. at 1885.

Here, I agree with Campbell that the interactive component of Reisch's Twitter account—including the space below each tweet where users could reply to Reisch and engage with other members of the public who might have been responding to her—constituted a designated public forum. Reisch used her Twitter account to interact with and communicate information to the public, including her constituents. Unlike with her Facebook page, which she kept private (that is, accessible only to friends, family, and personal acquaintances), Reisch did "not attempt[] to limit the [Twitter] Account's interactive feature to [her] own speech." Knight I, 928 F.3d at

_____

[1]In Knight I, the Second Circuit summarized the impact of blocking a Twitter user: "A blocked account is prevented from viewing any of the [official's] tweets, replying to those tweets, retweeting them, or liking them," the last three of which constitute "expressive conduct that blocking inhibits." 928 F.3d at 237. Blocking a Twitter user also "limits their ability to participate with other members of the public in the comment threads that appear below [the official's] tweets." Id. at 232.

-13-

239; see id. (explaining that the "case does not turn on the President's initial tweets," which constitute government speech, but "on his supervision of the interactive features" of the Twitter account). Though Reisch emphasizes that she did not control users' access to *Twitter*, what is relevant is that she controlled access to the interactive features of her own account. See id. at 234-36; Davison, 912 F.3d at 683. And while Reisch's tweets—standing alone—may constitute government speech, in maintaining an interactive space through her Twitter account, she ultimately created a designated public forum.

Just as public officials "may not preclude persons from participating" in the public-comment portion of a town hall meeting "based on their viewpoints," Knight II, 953 F.3d at 221 (Parker, J., statement with respect to denial of reh'g en banc), Reisch cannot block users from her Twitter account because she dislikes their opinions. But this is precisely what Reisch did. The weight of the evidence, including Reisch's own testimony at trial and during her deposition, shows that Reisch blocked Campbell (and others) because she thought he shared the view of Missouri State Representatives Bruce Franks and Kip Kendrick that she engaged in "unacceptable" behavior as a public official. Because Reisch, acting under color of state law, was "impermissibly motivated by a desire to suppress a particular point of view" when she blocked Campbell, Davison, 912 F.3d at 687, I believe she discriminated against Campbell based on his viewpoint, thereby violating the First Amendment.

For these reasons, I would affirm the district court's judgment.

_____

-14-