IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Penncrest School District, | : | |
| Appellant | : | |
| | : | No. 1463 C.D. 2021 |
| v. | : | Argued: October 12, 2022 |
| | : | |
| Thomas Cagle | : | |

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge
                  HONORABLE ELLEN CEISLER, Judge
                  HONORABLE LORI A. DUMAS, Judge
                  HONORABLE STACY WALLACE, Judge

OPINION
BY JUDGE DUMAS                                      FILED: April 24, 2023

Penncrest School District (Penncrest) appeals the order from the Court of Common Pleas of Crawford County (trial court), which denied Penncrest's petition for review and essentially compelled disclosure of the records requested by Thomas Cagle (Cagle) under the Right-to-Know Law (RTKL).[1]  Upon review, we vacate the order below, remand with instructions, and dismiss Cagle's application for relief as moot.

## I. BACKGROUND

In May 2021, a high school library in Penncrest displayed at least six books addressing LGBTQ+ issues in anticipation of Pride Month.  A third party photographed the displayed books and then publicly posted the photograph, apparently on that person's own Facebook[2] social media account.  Cagle's Answer

---

[1] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

[2] "Facebook is a social networking website.  Users of that Web site may post items on their

to Pet. for Judicial Rev. (Answer), 10/27/21, Ex. C. The third party purportedly commented, "Hey Maplewood/PENNCREST parents…just a little pic of what is on display at Maplewood High School Library… I realize this makes me a hater, but I am totally ok with that label…[.]" *Id.* (ellipses in original).

David Valesky (Valesky), a member of the Penncrest School Board (Board), then publicly "shared" the post on his own personal Facebook account with an additional comment. *Id.*; Penncrest's Reply to Cagle's New Matter, 11/3/21, ¶ 35. Valesky commented: "This is on display at Maplewood High School. Besides the point of being totally evil, this is not what we need to be teaching kids. They aren't at school to be brainwashed into thinking homosexuality is okay. Its [sic] actually being promoted to the point where it's even 'cool.'" Answer, Ex. C. Subsequently, Luigi DeFrancesco (DeFrancesco), President of the Board, publicly "shared" the third party's original post without comment on DeFrancesco's own personal Facebook account. *Id.*, Ex. D.

A few days later, a local newspaper published an article about the above

---

Facebook page that are accessible to other users, including Facebook 'friends' who are notified when new content is posted." *Carr v. Dep't of Transp.*, 230 A.3d 1075, 1077 n.1 (Pa. 2020) (cleaned up); *Owens v. Centene Corp.*, No. 20-CV-118, 2021 WL 878773, at *5 (E.D.N.Y. filed Mar. 9, 2021) (explaining that a post viewable by the "public" is depicted with a "globe" icon). *Cf. Davison v. Randall*, 912 F.3d 666, 673 (4th Cir. 2019) (distinguishing between Facebook profiles and pages in resolving the existence of state action). Recipients of a post may "like" or comment on a post. *Id.* at 674. "Each like or comment identifie[s] the name of the personal profile or page of the authoring party." *Id.* (cleaned up). Generally, a Facebook user may "block" another person on that user's profile or page, which prevents that person from commenting. *Lindke v. Freed*, 37 F.4th 1199, 1202 (6th Cir. 2022), *petition for cert. filed*, (U.S. Dec. 29, 2022) (No. 22-611).

Generally, federal court decisions are not binding on this Court. *NASDAQ OMX PHLX, Inc. v. PennMont Secs.*, 52 A.3d 296, 303 (Pa. Super. 2012) (*NASDAQ*). However, we typically follow Supreme Court or "Third Circuit precedent in preference to that of other jurisdictions" in resolving a federal issue. *Id.* (citation omitted). But if the Third Circuit has not ruled on a particular issue, we may seek guidance from other federal circuits and district courts. *Id.* It is well settled that we may cite Superior Court cases for their persuasive value. *Commonwealth v. Monsanto Co.*, 269 A.3d 623, 653 n.20 (Pa. Cmwlth. 2021).

social media posts. Office of Open Records (OOR) Op., 8/24/21, at 5-6. The article stated that Valesky intended to bring the matter up at the June 2021 Board meeting. *Id.* at 8.

In June, Cagle requested Facebook posts and comments "related to homosexuality and Penncrest School District, its officials, employees, or students, or its curriculum, physical [resources], or electronic resources, between January 1, 2020[,] through June 13, 2021, including posts or comments removed" or deleted by Valesky and DeFrancesco. Pet. for Judicial Review (Pet.), 9/16/21, Ex. A, at 2; *see also id.* at Ex. C, at 1 (alleging that the "posts and comments were later made private or removed").[3] In support, Cagle argued that the "issue of treatment of LGBTQ+ students and related [Penncrest] policies quickly became an important topic of public and official debate at the next four public meetings of the" Board, which were attended by hundreds of citizens. *Id.* at Ex. C, at 1. Penncrest countered that "LGBTQ+ rights . . . were not" and have not been on the Board's agenda. *Id.* at Ex. D; OOR Op. at 7 (same).

Penncrest's open records officer denied Cagle's requests for the above records. Ltr., 7/7/21.[4] In relevant part, Penncrest essentially denied the request on the basis that no such posts or comments existed for any Penncrest-owned Facebook accounts. *Id.* ¶¶ 3-6.[5]

---

[3] The request stated that any information identifying a student could be redacted. *See generally Easton Area Sch. Dist. v. Miller*, 232 A.3d 716, 731 (Pa. 2020) (plurality) (holding that the "students' right to informational privacy" "must be considered" in resolving a RTKL request). "Third parties whose personal information is contained within a public record must be afforded notice and an opportunity to be heard in a record request proceeding." *Id.* at 733.

[4] Penncrest provided responsive emails from Valesky's and DeFrancesco's Penncrest email accounts. Ltr., 7/7/21. Penncrest also stated that Valesky and DeFrancesco had no responsive "information from their personal email accounts." *Id.*

[5] Penncrest's petition for review alleges that although Penncrest uses its official "Facebook

3

Cagle timely appealed to the OOR, which granted relief to Cagle. In granting relief, the OOR cited *Purdy v. Borough of Chambersburg*, No. AP 2017-1229, 2017 WL 3587346 (Pa. Off. Open Recs., filed August 16, 2017), and *Boyer v. Wyoming Borough*, No. AP 2018-1110, 2018 WL 4293461 (Pa. Off. Open Recs., filed September 5, 2018), *appeal filed*, (Pa. Cmwlth., No. 715 C.D. 2021, April 16, 2021). OOR Op. at 7. Per OOR, those decisions provided a framework for resolving "whether a Facebook page is a record of the agency." *Id.* OOR explained that it was "immaterial" as to whether the agency controlled the Facebook page. *Id.* Rather, OOR reviewed the contents of the Facebook page to determine whether "it is used as a significant platform by an elected official or employee to conduct or discuss official business . . . ." *Id.* OOR noted that although the LGBTQ+ book display was not on the Board's agenda, the Board discussed the display in June 2021. *Id.* at 8.

Penncrest timely appealed to the trial court, which held argument. At argument, the parties disputed whether Cagle's requests were directed to the *personal* social media accounts of Valesky and DeFrancesco, as at that time, Penncrest "did not have its own . . . social media page." N.T. Hr'g, 11/16/21, at 4-5, 11. Cagle argued that at the time, Board members "made Facebook a significant platform for discussing [Penncrest] business, and they regularly post[ed] that . . . business on Facebook." *Id.* at 13.

The trial court affirmed, reasoning, *inter alia*, that it "does not matter if a Facebook post was made on the [Board's] Facebook [account] or on the . . .

---

page to publicize its activities . . . Penncrest does not intend that its Facebook page be used as a public forum or limited public forum." Pet. at ¶ 15 (cleaned up) (referencing Penncrest's social media policy). Subsequently, Cagle argued that Penncrest's social media policy "wasn't in effect yet" at the time of the posts in question. Notes of Testimony (N.T.) Hr'g, 11/16/21, at 13. But Cagle's argument is inaccurate. Penncrest adopted the policy on June 13, 2019, and revised it on July 8, 2021. Pet., Ex. F, at 1. Cagle probably intended to argue that the *revisions* were not in effect, but no party identified the revisions.

member's private Facebook [account]. These posts can become a 'record' if they are created by person(s) acting as a [Board] member and contain information related to" school business. Trial Ct. Op., 12/16/21, at 3. The trial court also reasoned that because Valesky was expressing his views about a topic within the Board's purview, he "created a public record" subject to the RTKL. *Id.* at 4.

Penncrest timely appealed and timely filed a court-ordered Pa. R.A.P. 1925(b) statement, which did not raise a First Amendment claim. *See* U.S. Const. amend. I; Pa. R.A.P. 1925(b) Statement, 1/18/22, at 1-3 (unpaginated). The trial court did not file a Rule 1925(a) opinion.

## II. ISSUES

Penncrest raises three issues.[6] First, Penncrest contends that social media posts and comments made to or from the Board members' personal social

---

[6] Penncrest's brief violates Pa. R.A.P. 2119(a), which requires that the argument section of its brief "be divided into as many parts as there are questions to be argued[.]" Pa. R.A.P. 2119(a). Penncrest raises three issues but divides its brief into four parts. *See* Penncrest's Br. at 5, 11-26. Also, Penncrest apparently argues that Board members do not lose their First Amendment right to express their opinions on matters of personal interest. Penncrest's Br. at 11-13; *see* Cagle's Br. at 21-22 (criticizing Penncrest's argument as both "confusing and illogical"). Because Penncrest failed to raise this issue in its Rule 1925(b) statement, Penncrest waived the issue for appellate review. *See City of Phila. v. Lerner*, 151 A.3d 1020, 1024 (Pa. 2016).

But even if the issue was preserved, it lacks merit. Penncrest's argument misapprehends the nature of the right: the First Amendment "prohibits only *governmental abridgment* of speech." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (emphasis added); *S.B. v. S.S.*, 243 A.3d 90, 104 (Pa. 2020); *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 902 (Pa. 2020); *Oberholzer v. Galapo*, 274 A.3d 738, 754 (Pa. Super.), *appeal granted*, 286 A.3d 1232 (Pa. 2022). The threshold inquiry in any First Amendment challenge is the existence of a state action, *e.g.*, a statute, an ordinance, or a court order, abridging speech. *Halleck*, 139 S. Ct. at 1928; *Wolf*, 227 A.3d at 902-03; *Oberholzer*, 274 A.3d at 754 (explaining that following the identification of the state action, the challenging party must prove the state's restriction on speech is content-based). Penncrest fails to identify the state action at issue, let alone address whether the state action is content-based or content-neutral. *See Wolf*, 227 A.3d at 902-03; *Oberholzer*, 274 A.3d at 754; *accord* Penncrest's Br. at 12 (stating Penncrest "does not regulate speech for members" of the Board).

5

media accounts are not related to the business of the Board or Penncrest. Penncrest's Br. at 5. Second, Penncrest claims that Board members acting in their capacity as private citizens are able to express their personal opinions by posting or commenting on matters of personal interest via their personal social media accounts without creating a record subject to disclosure. *Id.* Third, Penncrest argues that public attendees of a Board meeting who opine about the Board members' social media posts and comments do not create a record. *Id.*

### III. DISCUSSION[7]

Before addressing Penncrest's initial issue, we divide our discussion into several sections to facilitate our disposition. First, we present a general overview of the RTKL process. Specifically, we examine how the RTKL defines "record," including how a "record" must document a transaction or activity of an agency. Second, we review the disclosure of social media activity under the RTKL and similar statutes. This review also addresses conflicting federal precedents in an analogous context. Third, we distill and apply the applicable principles to this case.

### A. General Overview of the RTKL

The RTKL "is designed to promote access to official government information in order to prohibit secrets, scrutinize the actions of public officials, and make public officials accountable for their actions." *ACLU*, 232 A.3d at 656 (cleaned up). Under the RTKL, an agency must provide access to a public record upon request. *Cent. Dauphin Sch. Dist. v. Hawkins*, 286 A.3d 726, 741 (Pa. 2022). If the agency wishes to deny a request, then the agency must prove by a preponderance of

---

[7] Because the trial court was the Chapter 13 reviewing court, we review the trial court's order for an abuse of discretion, which includes an error of law. *Am. C.L. Union of Pa. v. Pa. State Police*, 232 A.3d 654, 662-63, 665 (Pa. 2020) (*ACLU*). For ease of disposition, when we refer to a "post," the term may also include other relevant social media activity, including comments and other electronic forms of communicating on such platforms.

the evidence that the requested information is privileged or otherwise exempt from disclosure. Sections 708(a)(1) and 901 of the RTKL, 65 P.S. §§ 67.708(a)(1), 67.901; *Bowling v. Off. of Open Recs.*, 75 A.3d 453, 457 (Pa. 2013).[8]

Section 102 of the RTKL defines "record" as "[i]nformation, regardless of physical form or characteristics, that documents a transaction or activity of an agency and that is created, received or retained pursuant to law or in connection with a transaction, business or activity of the agency." 65 P.S. § 67.102. Courts have construed the following phrases within this definition: (1) "documents a transaction or activity of an agency"; (2) "in connection with a transaction, business or activity"; and (3) "of the agency."

### 1. "Documents a Transaction or Activity"

With respect to the first phrase, we defined "documents" as "proves, supports, or evidences." *Bagwell v. Pa. Dep't of Educ.*, 76 A.3d 81, 91 (Pa. Cmwlth.

---

[8] Section 708(a)(1) states: "The burden of proving that a record of a Commonwealth agency or local agency is exempt from public access shall be on the Commonwealth agency or local agency receiving a request by a preponderance of the evidence." 65 P.S. § 67.708(a)(1). Section 901 states, "Upon receipt of a written request for access to a record, an agency shall make a good faith effort to determine if the record requested is a public record, legislative record or financial record and whether the agency has possession, custody or control of the identified record, and to respond as promptly as possible under the circumstances existing at the time of the request." *Id.* § 67.901.

The *Bowling* Court noted that under the statutory predecessor to the RTKL, *i.e.*, the Right-to-Know Act (RTKA), Act of June 21, 1957, P.L. 390, *as amended*, *formerly* 65 P.S. §§ 66.1-66.9, repealed by the Act of February 14, 2008, P.L. 6, the burden was on "the *requester* to establish that requested records were public records that he or she was entitled to inspect." *Bowling*, 75 A.3d at 455 (emphasis added). Subsequently, the General Assembly enacted the RTKL, which shifted the burden to the *agency*. *Id.* at 457; *accord ACLU*, 232 A.3d at 669. Section 1101(a)(1) of the RTKL, however, states that on *appeal* from a denial of a request, the "appeal shall state the grounds upon which the requester asserts that the record is a public record, legislative record or financial record and shall address any grounds stated by the agency for delaying or denying the request." 65 P.S. § 67.1101(a)(1). Section 1101(a)(1) appears to be in apparent tension with the statutory presumption in Section 305 of the RTKL that all records in the agency's possession are presumed to be a public record. *Id.* § 67.305.

2013) (*en banc*) (cleaned up); *Allegheny Cnty. Dep't of Admin. Servs. v. A Second Chance, Inc.*, 13 A.3d 1025, 1034-35 (Pa. Cmwlth. 2011) (*en banc*) (*Second Chance*). For example, this Court held that personal emails sent or received using an agency email address or located on an agency's computers are not "records." *Easton Area Sch. Dist. v. Baxter*, 35 A.3d 1259, 1264 (Pa. Cmwlth. 2012). We explained that personal emails are not "records" because they do not "document[] a transaction or activity of an agency," even if the agency had a policy precluding personal use of agency computers. *Id.*

Similarly, in *Pennsylvania Office of Attorney General v. Bumsted*, 134 A.3d 1204 (Pa. Cmwlth. 2016), we resolved whether "personal emails sent and received on [an agency's] email address" were "records" under the RTKL. *Bumsted*, 134 A.3d at 1208. The *Bumsted* Court noted that "emails not involving the agency business being sent, received[,] or retained in violation of agency policy regarding use of a work email address for personal emails does not transform that information that was not a . . . record into a . . . record under the RTKL." *Id.* at 1209. Because the requester sought pornographic emails, the *Bumsted* Court reasoned that such emails "cannot relate to any [agency] transaction or activity" and therefore reversed the OOR. *Id.* (cleaned up).

The *Bumsted* Court also posited that "if private emails that have nothing to do with an agency's business are somehow transformed into public records," then that raises privacy issues. *Id.* at 1209 n.10. Agency "employees and third parties who received or sent those emails," the *Bumsted* Court reasoned, "would be required to be given written notice and a meaningful opportunity to object at the request stage to the disclosure of their emails to establish that their release would be an unwarranted invasion of their privacy." *Id.*

8

## 2. "In Connection With a Transaction, Business, or Activity"

As for the second phrase, we held that a "record" includes "information created by a private contractor *in connection* with its contractual obligations to the agency." *W. Chester Univ. of Pa. v. Browne*, 71 A.3d 1064, 1068 (Pa. Cmwlth. 2013) (emphasis added); *Second Chance*, 13 A.3d at 1035 (same). For example, in *Browne*, the requester sought from a university the benefit plan of one of the university's contractors. *Browne*, 71 A.3d at 1066. The OOR granted the request, reasoning that the information was "directly related to a contract delegating a governmental function . . . ." *Id.* (cleaned up). The *Browne* Court explained that the benefit plan documented a relationship between the contractor and *its* employees. *Id.* at 1068. But the benefit plan did not relate to any relationship between the contractor and the *agency*, *i.e.*, the benefit plan was "not created *in connection* with [the contractor's] contract with the university." *Id.* (emphasis added and cleaned up). Thus, the *Browne* Court reversed the OOR, reasoning that the contractor's benefit plan did "not document a transaction or activity of the university, nor was it created, received[,] or retained by the university." *Id.* (cleaned up).

Similarly, in *Second Chance*, the trial court ordered the agency to disclose the names, birthdays, and hire dates of a private contractor's employees that provided services to the agency. *Second Chance*, 13 A.3d at 1027. The agency appealed, arguing that it did not possess such information. *Id.* at 1036. The *Second Chance* Court agreed, reasoning that the trial record did not indicate that (a) the agency possessed or created such information, or (b) the information originated from the agency. *Id.* at 1035-36. The Court, however, remanded for further proceedings to resolve whether the requested information was directly related to the contractor's performance of a governmental function under the agency's contract. *Id.* at 1040.

9

Thus, in cases involving third-party contractors, we have construed the phrase "in connection with" to be related to the contractors' performance of a governmental function. *See Browne*, 71 A.3d at 1068; *Second Chance*, 13 A.3d at 1040. In other words, even if the social media post did not originate from the agency or if the agency did not possess or create the post, if the post directly relates to the agency's governmental function, the post may be subject to RTKL disclosure. *See Browne*, 71 A.3d at 1068; *Second Chance*, 13 A.3d at 1040.

### 3. "Of the Agency"

Third, the prepositional phrase "of the agency," is a limiting phrase applicable to each of the listed items preceding the phrase, *i.e.*, "transaction, business or activity[.]" *See* Section 102 of the RTKL, 65 P.S. § 67.102; *Rendell v. Pa. State Ethics Comm'n*, 983 A.2d 708, 715 n.7 (Pa. 2009). In the context of the RTKL, we have explained that the "preposition 'of' indicates a record's origin, its owner or possessor, or its creator." *Bagwell*, 76 A.3d at 91 (cleaned up). In addition to information created by or otherwise originating with the agency, a "record" also includes information in the agency's possession. *Id.* Thus, we held that correspondence received by the agency may qualify as "records" as long as they document agency transaction, business, or activity. *Id.* at 90.

We have examined whether emails of an elected public official were "of the agency," and thus within the scope of the RTKL. For example, in *In re Silberstein*, 11 A.3d 629 (Pa. Cmwlth. 2011), we addressed whether emails on a township commissioner's personal computer were subject to the RTKL. *Silberstein*, 11 A.3d at 630, 633.[9] We held that the commissioner was not a governmental agency

---

[9] In *Silberstein*, the requester unsuccessfully sought from the township, among other items, emails between a township commissioner and citizens of the township. *Silberstein*, 11 A.3d at 630.

and had "no authority to act alone on behalf of the" township. *Id.* at 633. The Court explained that "emails . . . found on [the commissioner's] personal computer would not fall within the definition of record as any record personally and individually created by [the commissioner] would not be a documentation of a transaction or activity *of* York Township, as the local agency, nor would the record have been created, received[,] or retained pursuant to law or in connection with a transaction, business or activity *of* York Township." *Id.* (emphases in original). The *Silberstein* Court thus affirmed the denial of a request for such emails unless those items "were produced with the authority of [the township], as a local agency, or were later ratified, adopted or confirmed by" the township. *Id.*

Similarly, in *Mollick v. Township of Worcester*, 32 A.3d 859 (Pa. Cmwlth. 2011), the requester sought emails stored on the township supervisors' personal email accounts, asserting that "deliberation of township business by a quorum of the [three township] supervisors is an activity of the township." *Mollick*, 32 A.3d at 872 (cleaned up).[10] The *Mollick* Court distinguished *Silberstein* by reasoning that the requester was not requesting emails in which the township supervisor "acted individually, alone, or communicated only with an outside third party." *Id.* at 873. Accordingly, the *Mollick* Court held that "if two or more township

The township did not disclose any responsive emails on the commissioner's personal computer. *Id.* On appeal, the requester argued that the commissioner is an elected public official, and, as such, is an agency actor and subject to the township's control. *Id.* at 632. The requester thus reasoned that public records may be located on the commissioner's personal email account and computer. *Id.* The commissioner countered that "a distinction must be made between transactions or activities of an agency which may be a 'public record' under the RTKL and the emails or documents of an individual public office holder." *Id.* at 633.

[10] We acknowledge that *Mollick* involved the intersection of the Sunshine Act, 65 Pa. C.S. §§ 701-716, and The Second Class Township Code, Act of May 1, 1933, P.L. 103, *as amended*, 53 P.S. § 65101-68701. For purposes of our discussion here, very simply, under the RTKL, a record includes a discussion of township business between a quorum of township supervisors. *See Mollick*, 32 A.3d at 872 & n.21, 874.

11

supervisors exchanged emails that document a transaction or activity of the township and that were created, received, or retained in connection with a transaction, business, or activity of the township, the supervisors may have been acting as the township . . . ." *Id.* at 872. Thus, those exchanged emails would be records "of the township." *Id.* at 872-73.[11]

In *Barkeyville Borough v. Stearns*, 35 A.3d 91 (Pa. Cmwlth. 2012), the Court addressed personal emails between borough council members. *Stearns*, 35 A.3d at 93. The *Stearns* Court explained that the emails at issue were public records of the borough, as such emails were created "by public officials, *in their capacity* as public officials, for the purpose of furthering [b]orough business." *Id.* at 97 (emphasis added). The Court therefore affirmed disclosure under the RTKL. *Id.* at 98.[12]

In contrast to township commissioners, township supervisors, and borough council members above, in *Baxter*, we addressed a RTKL request for all emails from nine school board members, among other people. *Baxter*, 35 A.3d at

---

[11] The *Mollick* Court, however, held that it could not resolve whether the emails exchanged between a quorum of the township supervisors constituted "deliberation of township business" under the Sunshine Act *Mollick*, 32 A.3d at 875 (cleaned up). We concluded that the township's open records officer erred as a matter of law by failing to conduct a good faith review of the requested emails to determine whether such emails were "for the purpose of deliberation of the township's business by a quorum of the supervisors." *Id.* (cleaned up). The Court therefore remanded and instructed the open records officer to conduct that good faith inquiry. *Id.* Thus, it appears that "personal" emails, *i.e.*, emails not deliberating township business, between a quorum would not be "public records." *See id. Cf. Bumsted*, 134 A.3d at 1209.

[12] Unlike *Mollick*, however, the *Stearns* Court did not address whether, in order to qualify as "furthering borough business," it was necessary to find that a quorum or majority of the borough council was required to transact borough business. *See Mollick*, 32 A.3d at 875. The *Stearns* Court also did not discuss whether the emails "were produced with the authority of [the borough], as a local agency, or were later ratified, adopted or confirmed by" the borough. *See Silberstein*, 11 A.3d at 633. However, those issues may not have been before the *Stearns* Court. *See Maloney v. Valley Med. Facilities, Inc.*, 984 A.2d 478, 485-86 (Pa. 2009) (noting that all "decisions are to be read against their facts").

12

1260. In relevant part, the school district opposed the request, citing *Silberstein*. *Id.* at 1261. Specifically, the district contended that "because individual school board members do not have the authority to act on behalf of the [s]chool [d]istrict, any emails to or from those individuals absent ratification or adoption by the [s]chool [d]istrict do not constitute activity of the *agency* and are not records." *Id.* at 1262 (emphasis in original). However, the *Baxter* Court summarily held that while "an individual school board member lacks the authority to take final action on behalf of the entire board, that individual acting in his or her *official capacity*, nonetheless, constitutes agency activity when discussing agency business." *Id.* at 1264 (emphasis added and footnote omitted).[13]

In sum, with respect to the disclosure of emails of individual public officials, this Court's precedents are in apparent tension. On one hand, the individual public official must be acting in an official capacity, *i.e.*, acting with the authority of the agency. *See Baxter*, 35 A.3d at 1264; *Stearns*, 35 A.3d at 97. On the other hand, in order to be acting with the authority of the agency, we have suggested that the individuals must have the authority to bind the agency. *See Mollick*, 32 A.3d at 872; *Silberstein*, 11 A.3d at 633.

Although these cases provide useful guidance, email differs from social media as a method of communication. *Cf. Oberholzer*, 274 A.3d at 752 (explaining

---

[13] The *Baxter* Court cited *Stearns* in support. *Baxter*, 35 A.3d at 1264. As discussed herein, *Stearns* addressed the issue of emails between members of a borough council, unlike the instant school board, which is subject to the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1-101 to 27-2702. The *Baxter* Court, however, did not explain why it seemingly rejected the *Silberstein* Court's reasoning that an individual public official must have some authority to "act on behalf" of the agency or that the requested information must be produced with the authority of, or otherwise later ratified by, the agency. *See Silberstein*, 11 A.3d at 633. The *Baxter* Court also did not address the *Mollick* Court's reasoning that a township requires a quorum of supervisors in order to conduct business, albeit in the context of the Sunshine Act. *See Mollick*, 32 A.3d at 872-73.

13

that each medium of expression may require a different analytical framework). Wooden application of principles extracted from our email cases to social media activity may be unwise. *See Maloney*, 984 A.2d at 486. Accordingly, we examine the disclosure of social media activity under the RTKL and similar statutes, as well as when such activity could be considered official state action.

## B. Disclosure of Social Media Activity as a Public Record

We begin our discussion with Pennsylvania decisions. Next, we review non-Pennsylvania decisions, including analogous federal precedents.

### 1. Pennsylvania Jurisprudence

Although no Pennsylvania court has addressed a RTKL request for records of social media activity, the OOR has addressed it in two cases: *Purdy*, 2017 WL 3587346; and *Boyer*, 2018 WL 4293461, which is currently on appeal before this Court. *See* Penncrest's Br. at 14-15; Cagle's Br. at 17. Briefly, in both cases, the OOR granted the request for access to social media posts. *Purdy*, 2017 WL 3587346, at *3; *Boyer*, 2018 WL 4293461, at *4.

In *Purdy*, the requester sought from the borough all Facebook posts and comments from the mayor's private Facebook account. *Purdy*, 2017 WL 3587346, at *1. The borough opposed the request, arguing that the requester sought "records of a private Facebook account because the account was not created, administered[,] or required by the" borough. *Id.* The OOR granted the request, reasoning that the mayor's page (1) contained "discussions and posts regarding" borough activities, and (2) was linked to the borough's page. *Id.* at *3 (citing *Davison v. Loudoun Cnty. Bd. of Supervisors*, 267 F. Supp. 3d 702 (E.D. Va. 2017), *aff'd sub nom. Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019)). The OOR considered "immaterial" that the borough had no oversight and did not authorize the mayor's Facebook account. *Id.*

14

In *Boyer*, the requester solicited from the borough extensive information[14] from the mayor's "public figure" Facebook page. *Boyer*, 2018 WL 4293461, at *1.[15] The borough opposed, arguing that the requester sought records of a private Facebook account not controlled by the borough. *Id.* at *3. Citing *Purdy*, the OOR rejected the borough's argument. *Id.* The OOR maintained that it was required to examine the content of the Facebook page to determine whether it was "used as a significant platform by an elected official to conduct official business." *Id.* The OOR defined "official business" as including the statutory "powers and duties of borough mayors." *Id.*

Following review of the page, the OOR held that "[n]early all of the postings on the face of the page" consisted of the mayor's "opinion on news stories involving the borough and political entities affiliated with the borough, announcements of borough council meeting times and places, and discussion on topics of public interest within the borough." *Id.* at *4 (cleaned up). Despite the mayor's Facebook page not being authorized by the borough, the OOR reasoned that the mayor "possesse[d] his own set of responsibilities and powers in overseeing the borough as its mayor, and it is apparent that he uses this Facebook page in his role as mayor as a tool to foster community action and engagement." *Id.* (cleaned up). The OOR granted the request, the court of common pleas reversed, and the

---

[14] The requested information included all comments, posts, and other electronic messages. *Boyer*, 2018 WL 4293461, at *1.

[15] The *Davison* Court explained the differences between "personal Facebook profiles, which are for non-commercial use and represent individual people," and Facebook "pages" that "help businesses, organizations, and brands share their stories and connect with people" and are "managed by people who have personal profiles[.]" *Davison*, 912 F.3d at 673 (cleaned up).

Further, a Facebook profile is "a private account limited to [5,000] 'friends.'" *Lindke*, 37 F.4th at 1201. A person may convert a Facebook profile to a Facebook "page, which has unlimited 'followers' instead of friends." *Id.* (cleaned up). A Facebook page may be public or private, and a page can be categorized as a "public figure" page. *See id.*

requester's appeal is pending before this Court.

We glean the following. In both decisions, the OOR examined whether (1) the public official's page had the "trappings" of an official agency page, and (2) the contents of the posts reflected agency activities or business. *See Purdy*, 2017 WL 3587346, at *3; *Boyer*, 2018 WL 4293461, at *4. In addressing whether the posts reflected agency activities or business, the OOR considered the public official's statutory duties and powers. *Boyer*, 2018 WL 4293461, at *4.

The OOR's consideration of a public official's statutory obligations seemingly reflects two concerns. First, the concern that a request could encompass a public official's private social media activity using agency resources, *i.e.*, social media activity not documenting an agency's transaction or business. *Cf. Bumsted*, 134 A.3d at 1209 (rejecting request for private emails); *Baxter*, 35 A.3d at 1264 (holding that personal emails using agency resources are not records). Second, the concern that a request for social media activity could encompass *unauthorized* activity by a public official. *See Purdy*, 2017 WL 358734, at *3; *Boyer*, 2018 WL 4293461, at *4. Accordingly, a request for social media activity must reflect activity produced with the agency's authority or otherwise ratified by the agency. *Cf. Silberstein*, 11 A.3d at 633 (denying request for personal emails absent those two conditions); *Stearns*, 35 A.3d at 97 (compelling disclosure of emails created by public officials in their official capacity). In considering the contours of whether such activity was authorized, we have examined whether a public official had the authority to bind the agency. *Cf. Silberstein*, 11 A.3d at 633; *Mollick*, 32 A.3d at 872-73 (opining that emails exchanged between quorum of supervisors may constitute agency business). *But cf. Baxter*, 35 A.3d at 1264 (holding that although an individual school board member has no authority to bind the board, emails to or from

16

that member in that member's official capacity may be agency business).

## 2. Non-Pennsylvania Jurisprudence

Having summarized existing Pennsylvania jurisprudence, we next discuss non-Pennsylvania cases. First, we discuss a case from Washington state. Second, we summarize conflicting federal precedents addressing whether an individual public official's social media activity constitutes official state action.

Outside of Pennsylvania, few courts have addressed the disclosure of a public official's social media activity in an RTKL context. For example, a Washington state court resolved whether posts on a city council member's personal Facebook page were subject to disclosure under that state's RTKL equivalent. *West v. Puyallup*, 410 P.3d 1197, 1199 (Wash. Ct. App. 2018). Under Washington law, a public record is "any writing . . . containing information relating to the conduct of government or the performance of any governmental or proprietary function . . . prepared, owned, used, or retained by any state or local agency." *Id.* at 1201 (cleaned up). Initially, the *West* Court concluded that social media activity is a form of written communication that can convey information. *Id.* at 1201-02. Next, the *West* Court reviewed the public official's Facebook posts, which "were merely informational and did not directly address" governmental conduct or performance. *Id.* at 1202. Due to insufficient appellate briefing, the Court presumed that at least some of the posts related to governmental functions. *Id.*

The *West* Court then examined whether the council member prepared the posts on her personal Facebook page in her scope of employment, *i.e.*, "prepared by a government agency." *Id.* at 1202-03. The Court considered three factors: "whether (1) her position required the posts, (2) the city directed the posts, or (3) the posts furthered the city's interests." *Id.* at 1203 (cleaned up). The *West* Court stated

17

that although the council member's posts "referenced various issues" and occasionally linked to the city's official Facebook posts, they essentially disseminated "general information about the city." *Id.* at 1199-1200, 1204. The Court added that the page itself "was used to provide information to [the member's] supporters." *Id.* at 1204. The *West* Court acknowledged the informational nature of the council member's posts, but held that any benefit to the city was too attenuated to establish that she "was acting within the scope of employment or her official capacity . . . ." *Id.*

Federal circuits have addressed whether a public official was acting in an official capacity when engaging in social media activity, specifically in resolving liability under 42 U.S.C. § 1983.[16] Very simply, when "a state official acts in the ambit of his personal, private pursuits, section 1983 doesn't apply." *Lindke*, 37 F.4th at 1202 (cleaned up). "But the caselaw is murky as to when a state official acts personally and when he acts officially. That imprecision is made even more difficult here, since [courts] must [resolve the issue] in a novel setting: the ever-changing world of social media." *Id.* In other words, case law does not clearly differentiate "between public officials' governmental and personal activities." *Id.* (emphasis omitted). Although Section 1983 differs from the RTKL, both analytical frameworks address whether a public official's action is taken in his or her official capacity. *Compare Leshko*, 423 F.3d at 340, *with, e.g.*, *Stearns*, 35 A.3d at 97.

---

[16] The Third Circuit has comprehensively discussed the two categories of state actions claims, as well as the three broad tests used to resolve the existence of a state action in this circuit. *See Leshko v. Servis*, 423 F.3d 337, 340 (3d Cir. 2005); *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009); *see also NASDAQ*, 52 A.3d at 303. Briefly, the "first category involves an *activity* that is significantly encouraged by the state or in which the state acts as a joint participant," and the "second category of cases involves an *actor* that is controlled by the state, performs a function delegated by the state, or is entwined with government policies or management." *Leshko*, 423 F.3d at 340 (emphases in original).

Although the federal circuits have attempted to clarify the Section 1983 case law in this novel medium, they have not settled on a uniform framework. The absence of uniformity derives from how each circuit resolves Section 1983 claims. In other words, the circuits' varied approach to social media activity is less about some profound disagreement and more about each circuit having to adhere to their own unique precedents.

For example, the Sixth Circuit focuses on the Facebook account as a whole, and not on any particular post, in resolving whether a public official runs the account as an official or personal account. *Lindke*, 37 F.4th at 1203. In *Lindke*, Freed was appointed a city manager and revised his Facebook account to reflect his new position. *Id.* at 1201.[17] He also listed the city's website "as his page's website," the city's email address "as his page's contact information, and the city hall address as his page's address." *Id.* (cleaned up).

The *Lindke* Court described Freed as an active Facebook user who (a) shared photos of his child's birthday, visits to community events, and his family's picnics; and (b) posted about "the administrative directives he issued as city manager," and COVID-19 city policies, public health measures, and statistics. *Id.* Lindke responded by criticizing the COVID-19 posts in the comments section. *Id.* at 1201-02. Freed deleted the criticism and eventually blocked Lindke, which led to this suit. *Id.* at 1202.

---

[17] Freed used to have a private Facebook profile limited to his "friends," but "he grew too popular for Facebook's 5,000-friend limit on profiles." *Lindke*, 37 F.4th at 1201. Before he was appointed as a city manager, Freed converted his profile to a "'page,' which has unlimited 'followers' instead of friends," and categorized his page as for a "public figure." *Id.*; *see also Davison*, 912 F.3d at 673 (explaining that "unlike personal Facebook profiles, which are for non-commercial use and represent individual people, Facebook Pages . . . help businesses, organizations, and brands share their stories and connect with people. Pages are managed by people who have personal profiles . . . ." (cleaned up)).

In resolving whether Freed was acting in his official capacity, the *Lindke* Court examined whether Freed's ban was "entwined with governmental policies or subject to the government's management or control," *i.e.*, whether Freed acted "pursuant to his governmental duties or cloaked in the authority of his office." *Id.* at 1203 (cleaned up). The Court explained that to resolve whether Freed's "act is fairly attributable to the state[,] we need more background than a single post can provide." *Id.* (cleaned up). Accordingly, the Court examined Freed's social media "page or account as a whole [and] not each individual post." *Id.*

In reviewing the account as a whole, the *Lindke* Court inquired into whether Freed ran "his Facebook page as an official" or as a "personal pursuit." *Id.* In other words, the issue was whether Freed's social media activity was (1) part of his actual or apparent duties, or (2) "couldn't happen in the same way without the authority of the office." *Id.* (cleaned up). In addressing this issue, the *Lindke* Court considered the following nonexclusive factors: whether (1) state law requires the office holder to maintain a social media account; (2) state funds are used in running the account; (3) the account belongs to the state or office itself; and (4) operating the account requires the authority of the office, *e.g.*, the office holder instructs government staff to operate the account. *Id.* at 1203-04.

Applying the above factors, the *Lindke* Court held that Freed's page did not belong to the office, was created prior to Freed taking office, would not be transferred to a successor office holder, and was maintained solely by Freed and not any government employees. *Id.* at 1204-05. Further, Freed's city manager duties did not include operating a Facebook page. *Id.* Although Freed believed that regular communication was "essential to good government," that belief "can't render *every* communication state action." *Id.* at 1205 (emphasis in original). Accordingly, the

20

Sixth Circuit held that Freed "didn't transform his personal Facebook page into official action by posting about his job. Instead, his page remains personal—and can't give rise to section 1983 liability." *Id.* at 1207; *see also id.* at 1206 (reasoning that Freed's "posts do not carry the force of law simply because the page says it belongs to a person who's a public official").

The Sixth Circuit acknowledged that the Second, Fourth, Eighth, and Eleventh Circuits focus "on a social-media page's purpose and appearance" and find state action exists if the presentation of that account "is connected with the official's position." *Id.* at 1205-06.[18] The *Lindke* Court rejected that focus, essentially reasoning that Sixth Circuit precedent required more than a facial examination. *See id.* at 1206.

We briefly discuss the approaches taken by the Fourth, Eighth, and Ninth Circuits.[19] In *Davison*, the Fourth Circuit reasoned that the public official created and administered the social media account at issue to further her duties as an elected official. *Davison*, 912 F.3d at 680. She used the account to notify the public about official activities and solicit the public's input on various policy issues. *Id.* The *Davison* Court also held that the account had "the trappings of her office," including a "governmental official" category and her official email address and telephone number. *Id.* The Fourth Circuit thus held that the official's social media ban was a state action for Section 1983 purposes. *Id.* at 681.

The Eighth Circuit also reviewed a public official's social media

---

[18] *See Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019), *vacated*, 141 S. Ct. 1220 (2021); *Davison*, 912 F.3d at 680; *Campbell v. Reisch*, 986 F.3d 822, 826 (8th Cir. 2021); *Charudattan v. Darnell*, 834 F. App'x 477, 482 (11th Cir. 2020) (*per curiam*).

[19] The Second Circuit decision was vacated, and the Eleventh Circuit decision is non-precedential. Following *Lindke*, the Ninth Circuit issued its decision in *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1170 (9th Cir. 2022), *petition for cert. filed*, (U.S. Oct. 4, 2022) (No. 22-324).

account and concluded that the official had essentially used it for campaigning. *Campbell*, 986 F.3d at 823. Upon being elected, the official sporadically "tweeted[20] about her work as a state representative" and "specific legislation," and used her account "to engage in discourse about political topics and/or to indicate her position relative to other . . . officials." *Id.* at 824 (cleaned up). Notwithstanding such posts, the *Campbell* Court held that the official's post-election use of the social media account was substantially similar to her pre-election use, and therefore the official's ban was not a state action. *Id.* at 826.[21]

In *Garnier*, the Ninth Circuit similarly examined whether two school board members' use of their social media accounts furthered their official duties. *Garnier*, 41 F.4th at 1170. In that case, the board members created their accounts to promote their campaigns for office. *Id.* at 1163. After winning, the members revised their accounts to reflect their current office and posted about various school district "goings-on," school board meetings, and important board decisions. *Id.*

The *Garnier* Court reviewed the members' social media accounts' appearance and their content, and it held that the members acted as state actors when they blocked constituents. *Id.* at 1171. First, the members identified themselves as public officials in their accounts and the overwhelming content of the posts were devoted to publicizing official board activities. *Id.* Second, they used "their social media pages as official outlets" for performing their board duties, which "had the purpose and effect of influencing" others. *Id.* (citation omitted). Third, the

---

[20] The term "tweet" is defined as a "*post* made on the Twitter online message service," which is a social media platform. *Tweet*, Merriam-Webster (emphasis added).

[21] The *Campbell* Court distinguished *Davison* on the basis that the official's infrequent social media use for official government activity was outweighed by the frequency of posts emphasizing "her suitability for public office." *Campbell*, 986 F.3d at 827. Thus, somewhat similar to the Sixth Circuit, the *Campbell* Court also considered the volume of posts.

members' "management of their social media pages related in some meaningful way to their governmental status and to the performance of their duties." *Id.* (cleaned up). The *Garnier* Court rejected the members' arguments that their accounts were campaign pages and that the state did not fund or authorize them. *Id.* at 1172. With respect to the latter, the Ninth Circuit held that their accounts did not contain any disclaimer that the members' statements were not made in an official capacity. *Id.*

### C. Application of the RTKL to Social Media

With that background in mind, we begin by summarizing Penncrest's argument in support of its first issue and then discuss our framework for applying the RTKL to social media activity. On appeal, Penncrest argues that although Valesky and DeFrancesco are public officials, they created the social media posts on their personal social media accounts in their personal capacities. Penncrest's Br. at 14-15, 20. In Penncrest's view, even if their personal social media posts reflect Penncrest's activities, those posts are not "records" under the RTKL. *Id.* at 17. Penncrest reasons that the posts "did not document, prove, support, or evidence any [Penncrest] transaction or activity . . . ." *Id.* Penncrest similarly explains that the posts "were not created, received, or retained in connection" with any Penncrest transaction or activity. *Id.* at 17-18.

To briefly reiterate, Section 102 of the RTKL defines "record" as information, *e.g.*, social media activity, "that documents a transaction or activity of an agency and that is created, received or retained pursuant to law or in connection with a transaction, business or activity of the agency." 65 P.S. § 67.102. Accordingly, social media activity must comply with three criteria: (1) it must prove, support, or evidence an agency's transaction or activity;[22] (2) it was created, received, or retained

---

[22] *See, e.g.*, *Baxter*, 35 A.3d at 1264 (excluding personal emails); *Bumsted*, 134 A.3d at 1209 (precluding pornographic emails).

in connection with an agency's transaction, business, or activity;[23] and (3) it was created by, originated with, or possessed by the agency.[24]

In Pennsylvania, the OOR held that information on a borough mayor's private social media account were records because they discussed borough activities. *Purdy*, 2017 WL 3587346, at *3. The OOR similarly held that information from a borough mayor's "public figure" Facebook account were records "of the borough" because the account, although not authorized by the borough, was used to engage the community. *Boyer*, 2018 WL 4293461, at *4.

In Washington, the *West* Court examined whether the public official's position required the posts, the city directed the posts, or the posts furthered the interests of the city. *West*, 410 P.3d at 1203. The Court rejected the record request because, *inter alia*, the posts did not further the city's interests and the council member was not acting in her official capacity. *Id.* at 1204.

Federal circuits have identified various factors in resolving whether a public official's social media activity constituted state action, *i.e.*, was in the scope of his or her official capacity. *See, e.g.*, *Lindke*, 37 F.4th at 1203; *Davison*, 912 F.3d at 680; *Campbell*, 986 F.3d at 826; *Garnier*, 41 F.4th at 1170. The Sixth Circuit reviews the Facebook account "as a whole" and "not each individual post" to resolve whether the public official used the account in an official or personal capacity.

---

[23] *See, e.g.*, *Browne*, 71 A.3d at 1068 (explaining that a private contractor only had to disclose information created in connection with the agency's governmental functions).

[24] *See, e.g.*, *Bagwell*, 76 A.3d at 91; *Silberstein*, 11 A.3d at 633 (excluding a public official's personal emails as they did not prove, support, or evidence agency activity and would not be created, received, or retained by the agency); *Stearns*, 35 A.3d at 96-97 (holding personal emails at issue exchanged between borough council members were records "of the borough"); *Baxter*, 35 A.3d at 1264 (holding that emails to or from an individual school board member may be records of the board if that individual acted in an official capacity). *Cf. Mollick*, 32 A.3d at 872-73 (remanding to resolve whether emails exchanged between two township commissioners would be information "of the township" under the Sunshine Act and The Second Class Township Code).

*Lindke*, 37 F.4th at 1203. Therefore, the Sixth Circuit examines, *inter alia*, whether state law requires the office holder to maintain a social media account; state funds are used to run the account; the account belongs to the person or the office itself; and operating the account requires the authority of the office. *Id.* at 1203-04.

In contrast, three other circuits weigh the contents of the social media posts more heavily, in addition to examining the purpose and appearance of the account as a whole. *See Davison*, 912 F.3d at 680 (noting the posts furthered the public official's duties by notifying the public about official activities and requesting the public's input on policy issues); *Campbell*, 986 F.3d at 826 (concluding the vast majority of posts both pre- and post-election were campaign-related); *Garnier*, 41 F.4th at 1171 (stating that the vast majority of posts were for official activities).

If a public official posts on the agency's official, authorized social media account, then the RTKL analysis appears relatively straightforward. Presumptively, such posts would be public records. However, if a public official posted a personal social media post, *e.g.*, a family birthday, wedding, or other gathering, on the agency's social media account, the post probably would not be a record.[25] A record must document an agency transaction or activity and be created in connection with agency business. *See Baxter*, 35 A.3d at 1264.

But we are not faced with such a seemingly straightforward analysis. Instantly, we must resolve whether a public official's public post on his *personal* social media account is an agency "record." *See* 65 P.S. § 67.102.[26] As the *Lindke*

---

[25] We emphasize that suggested holdings to hypothetical examples are *dicta*. For one thing, the content of posts is not necessarily so easily categorized as either "personal" or "not personal."

[26] As noted herein, the posts at issue were flagged "public," and thus viewable by the public before the posts were flagged "private" or removed. No party has argued that the change in status of the posts, *i.e.*, from public to private or deletion, is a basis for non-disclosure. Further, no party has argued that the mere act of "sharing" a third-party's post is outside the scope of the RTKL.

Court colloquially framed the issue: "the caselaw is murky as to when a state official acts personally and when he acts officially" in the novel medium of social media. *See Lindke*, 37 F.4th at 1202.

Under our email jurisprudence, we would consider whether the school board member created the post with the school board's authority or the post was later ratified by the school board, *Silberstein*, 11 A.3d at 633, *i.e.*, in the school board member's official capacity. *See, e.g.*, *Mollick*, 32 A.3d at 872-73; *Baxter*, 35 A.3d at 1264; *Stearns*, 35 A.3d at 97.[27] But applying jurisprudence resolving email, *i.e.*, a medium that typically has one sender and limited recipients, may be inapt when the general public can view a social media post, like the posts at issue. *See Owens*, 2021 WL 878773, at *5.

Plainly, the issue is whether a school board member's public social media post documents a transaction or activity *of the school board*, or is created in connection with a transaction, business, or activity *of the school board*. *See* 65 P.S. § 67.102. If a school board member creates a social media post in connection with school board business, is it presumptively a record even if the post was made on the member's personal social media account? Does or should the answer change if the post was private?

We acknowledge the facial appeal of merely examining the content of the board member's social media post to ascertain whether the post proves, supports, or evidences a transaction or activity of the school board. But such an examination seemingly deemphasizes whether that board member acted in an official capacity. For example, consider a board member discussing a bad day at work by publicly posting on that person's personal social media account. Such a post seemingly

---

[27] In some cases, we have reasoned that a public official cannot be acting in an official capacity unless that official had the authority to bind the agency.

26

documents the agency's transaction or activity that day but does not suggest whether the agency authorized or otherwise ratified the post. *Cf. Silberstein*, 11 A.3d at 633; *Mollick*, 32 A.3d at 872-73.[28]

After careful consideration of the available jurisprudence, we hold that in resolving whether a school board member's social media post was "of an agency" under the RTKL, we must consider the following nonexclusive factors.[29] First, we examine the social media account itself, including the private or public status of the account, as well as whether the account has the "trappings" of an official agency account. *See Purdy*, 2017 WL 3587346, at *3; *Boyer*, 2018 WL 4293461, at *4; *Lindke*, 37 F.4th at 1203-04; *Davison*, 912 F.3d at 680; *see also Campbell*, 986 F.3d at 826 (holding that social media account at issue was private). We must also consider whether the school board member has an actual or apparent duty to operate the account or whether the authority of the public office itself is required to run the account. *See Lindke*, 37 F.4th at 1203-04 (discussing additional elements for each factor); *Boyer*, 2018 WL 4293461, at *4 (acknowledging the agency did not authorize the social media account but noting the public official used the account to fulfill the mayor's duties). Focusing *only* on the trappings of the account, *i.e.*, its appearance or purpose, is likely not dispositive, as we must also examine the universe of responsive posts. *Compare Campbell*, 986 F.3d at 826 (noting that private social media account occasionally used for official agency activity does not necessarily

---

[28] We acknowledge that a "private" Facebook profile may have up to 5,000 friends, but we decline to address the issue of whether a so-called "private" post on such a profile is *de facto* "public," let alone whether a "private" Facebook page with unlimited followers is "public."

[29] The weight given to each factor is left to the factfinder. *Cf. Charlie v. Erie Ins. Exch.*, 100 A.3d 244, 251 (Pa. Super. 2014); *NASDAQ*, 52 A.3d at 305. To be clear, the tribunal must consider the factor and may give it whatever weight it deems fit, but it must not reject outright any consideration of the factor. *See Purdy*, 2017 WL 3587346, at *3 (stating it was "immaterial" that the agency did not authorize the official's social media account).

transform the private account into an agency account), *with Garnier*, 41 F.4th at 1163 (discussing private accounts that transformed into agency accounts because, *inter alia*, the vast majority of posts addressed agency activity).[30]

Second, in examining the school board member's social media posts,[31] we consider the following. Initially, whether such posts prove, support, or evidence a transaction or activity *of an agency*. *See* 65 P.S. § 67.102. *Cf. Silberstein*, 11 A.3d at 633 (rejecting disclosure of commissioner's personal emails unless the agency authorized or later ratified the emails); *Mollick*, 32 A.3d at 875 (remanding to resolve whether emails between a quorum of township supervisors were for township business). In resolving the above, the content of the posts may be reviewed to address whether the posts were merely informational in nature, *i.e.*, did not directly prove, support, or evidence the agency's governmental functions. *See* 65 P.S. § 67.102 (defining a record as information documenting a transaction or activity of the agency). *Cf. Bumsted*, 134 A.3d at 1209 (rejecting request for private emails); *West*, 410 P.3d at 1202, 1204 (holding that posts (1) briefly referencing various agency issues, and (2) referencing and linking to posts of official agencies, were "merely informational and did not directly address the 'conduct' or 'performance' of governmental functions"); *cf. also Campbell*, 986 F.3d at 826 (considering the volume and content of agency versus non-agency posts on the account); *Garnier*, 41

---

[30] For example, assume a public official inadvertently publishes (or shares) a personal post on the agency's official social media account but immediately deletes the post. It seems questionable as to whether that post is subject to disclosure under the RTKL. *Cf. Bumsted*, 134 A.3d at 1209 (holding personal emails sent or received on an agency email address are not records); *Baxter*, 35 A.3d at 1264 (explaining that personal emails using agency resources are not records). If private posts or other communications on a social media platform implicate the privacy interests of third parties, then it appears they would be entitled to written notice. *See Bumsted*, 134 A.3d at 1209 n.10.

[31] By "posts," we also refer to other relevant social media activity, including comments and other electronic forms of communicating on such platforms.

F.4th at 1171 (same). We also address whether the posts were created, received, or retained by law or *in connection with* a transaction, business, or activity of an agency. *See* 65 P.S. § 67.102. *Cf. Browne*, 71 A.3d at 1068 (rejecting request for documents outside the governmental function of the agency); *Second Chance*, 13 A.3d at 1040 (remanding to clarify whether requested information was in connection to agency's performance of a governmental function).

Third, we consider "official capacity" with regard to the account and the posts.[32] Although the RTKL does not explicitly define "official capacity," we previously addressed whether the information at issue was produced under the agency's authority or subsequently ratified, adopted, or confirmed by the agency, *i.e.*, authorized activity. *See Silberstein*, 11 A.3d at 633. We explained that the information at issue must be created, received, or retained by public officials in their official capacity, *i.e.*, scope of employment, as public officials. *See Stearns*, 35 A.3d at 97; *Baxter*, 35 A.3d at 1264; *accord West*, 410 P.3d at 1203. *Cf. Lindke*, 37 F.4th at 1202 (expressing a need to differentiate a public official's governmental and non-governmental activities); *Davison*, 912 F.3d at 680 (noting that if social media activity occurs in the course of performing an official duty, then it is more likely to be considered state action); *Campbell*, 986 F.3d at 824 (holding that a public official's actions outside the scope of employment, *i.e.*, in the scope of personal pursuits, are not state actions). We may consider whether the agency required the posts, the agency directed the posts, or whether the posts furthered the agency's

---

[32] The first two factors of the framework do not explicitly address authorization. Assume a third party, without authorization, copied all of the "trappings" of the agency's official social media account and copied (or shared) the agency's official posts. Alternatively, assume an agency official acted without authorization and posted a qualifying post on the agency's social media account. At least with the former, it appears difficult to conclude that the RTKL would compel disclosure of deleted comments, etc., when the third party acted without the agency's authorization or ratification.

interests. *See West*, 410 P.3d at 1203; *Davison*, 912 F.3d at 680.

Instantly, based on the above, we respectfully disagree with the trial court's holding that it "does not matter" if the social media post was on a public or private account. *See* Trial Ct. Op. at 3. We also disagree with the court to the extent it suggested that merely because a board member expressed his views about board business in a social media post, he created a public record. *Id.* at 4. We hold the court must address, among other factors, whether that board member acted in an "official capacity." *See, e.g.*, *Baxter*, 35 A.3d at 1264. Thus, we remand to the trial court, as the initial Chapter 13 reviewing court, to expand the record as it deems necessary to resolve the foundational question of whether the social media activity at issue constitutes an agency record subject to disclosure under the RTKL based on the framework announced herein. *See Bowling*, 75 A.3d at 476. Nothing within our decision precludes the trial court from reaching its prior holding.

## IV. CONCLUSION

For these reasons, we vacate the trial court's December 16, 2021 order and remand for further proceedings consistent with our decision. Because of our disposition, we do not address Penncrest's remaining issues. We dismiss Cagle's application for relief as moot.

_____
LORI A. DUMAS, Judge

Judges McCullough, Covey and Wallace dissent.

30

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Penncrest School District,          :
                   Appellant     :
                                 :     No. 1463 C.D. 2021
            v.                  :
                                 :
Thomas Cagle                     :

# **O R D E R**

AND NOW, this 24th day of April, 2023, we vacate the December 16, 2021 order entered by the Court of Common Pleas of Crawford County and remand for further proceedings as set forth in our decision. Thomas Cagle's application for relief is dismissed as moot. Jurisdiction relinquished.

_____
LORI A. DUMAS, Judge